**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TYLER JOHNSTON, Individually and on behalf of all others similarly situated,

Plaintiff,

v.

LIFEMD, INC., JUSTIN SCHREIBER, and MARC BENATHEN,

Defendant(s).

Case No. 1:25-cv-09153-NRB

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

Page

I. Nature of the Action ..... 1

II. Jurisdiction and venue ..... 9

III. Parties ..... 10

A. Plaintiff ..... 10

B. The Corporate Defendant ..... 10

C. The Individual Defendants ..... 12

IV. Background on Accounting Principles ..... 14

A. The Principal vs. Agent Failure (ASC 606) ..... 14

B. The Criteria for Evaluating the Materiality of Restated Financials Under SEC Staff Accounting Bulletin No. 99 ..... 16

V. The Materially False and Misleading Statements at Issue ..... 18

A. March 10, 2025 – Press Release Announcing Fourth Quarter FY2025 Results ..... 18

B. March 10, 2025 – Investor Presentation ..... 23

C. March 10, 2025 – Investor Call ..... 27

D. March 11, 2025 – Annual Report for the 2024 Fiscal Year ..... 29

E. May 6, 2025 – Press Release Announcing First Quarter FY2025 Results ..... 33

F. May 6, 2025 – Earnings Call ..... 37

VI. The Truth Begins to Emerge ..... 39

VII. The Defendants' Restatements Were Material ..... 45

VIII. Additional Facts in Support of Scienter ..... 48

A. Defendant Benathen ..... 48

B. Auditor Turnover, Management Changes, and the Timing of LifeMD's Financial Revisions ..... 49

C. The Defendants Lacked a Reasonable Basis for the March and May 2025 Guidance. .......... 52

D. The Unusual Timing and Amount of Insider Sales by LifeMD's Most Senior Executives Suggests Scienter. .......... 55

1. Defendant Schreiber .......... 55

2. Defendant Benathen .......... 58

E. Additional Scienter Indicators Supporting the Known Falsity at the Time the Statements were Mad .......... 61

IX. Class Action Allegations .......... 62

COUNT I Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants .......... 64

COUNT II Violations of Section 20(a) of the Exchange Act Against the Individual Defendants .......... 66

Prayer for Relief .......... 67

Jury Trial Demand .......... 68

Lead Plaintiff, Gehui Zhao ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding LifeMD, Inc. ("LifeMD" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## I. NATURE OF THE ACTION

1. This securities fraud class action arises from a scheme by LifeMD, Inc. ("LifeMD" or the "Company"), its Chief Executive Officer Justin Schreiber, and its Chief Financial Officer Marc Benathen (collectively, "Defendants") to deceive investors about the Company's financial condition. From at least March 10, 2025 through November 18, 2025 ("Class Period"), the Defendants issued materially false and misleading statements about LifeMD's revenue, profitability, and growth trajectory—including the breakthrough milestone in May 2025 that LifeMD had its "***first-ever GAAP profitability***" quarter—while operating under severe internal control weaknesses that rendered their financial reporting unreliable. Defendants Schreiber and Benathen—LifeMD's highest executives—knew of the Company's internal control weaknesses through their regular participation in evaluating, establishing, and maintaining their effectiveness. Moreover, the Defendants' independent auditor, CBIZ CPAs, which lasted less than four months on the job, re-warned Defendants of "reportable events" regarding the Company's financial reporting, which management had said they had addressed by year end 2024, before being

[1] Unless otherwise stated, all emphasis is added.

dismissed. Nevertheless, in this climate, the Defendants recklessly issued and/or certified the materially false and misleading statements about LifeMD's financial health, without sufficient mitigating disclosures. These strong financial metrics excited analysts and investors, boosting LifeMD's stock price. What's worse, the Defendants sold millions of dollars of stock for the first time in the Company's history. However, when the truth emerged through a series of corrective disclosures concerning LifeMD's true financial state of affairs—including that the Company has yet to break its pattern of quarter-after-quarter losses, LifeMD's stock price collapsed from a high of $15.06 to a low of $4.09, losing over 72% of its value from Class Period highs. The Individual Defendants ceased all stock sales. This class action seeks to recompensate investors harmed by this alleged fraud.

2. LifeMD is a subscription-based telehealth company which purports to provide virtual primary care, urgent care, and specialized treatment for specialty issues, including weight management biologics and men's/women's health, in all fifty states. Founded in 1994, the Company originally focused on developing and marketing skincare and immunity-boosting supplements. In 2018, the Company made a strategic shift toward a high-cost, direct-to-consumer telehealth under the guidance of then-newly appointed CEO, Defendant Schreiber.

3. Today, LifeMD derives approximately 92% of its revenue from recurring subscriptions. Although the Company has enjoyed increasing revenues from its 2018 transition, the Company has also experienced escalating operational costs. As such, prior to the Class Period, both LifeMD and investors repeatedly noted that whether or not the Company could turn the corner from quarter-after-quarter losses into a profit generating entity was a material risk (and a material factor in analysts' valuations). In this vein, LifeMD's ability to ***accurately*** recognize its own revenues and costs has been critical to investors' abilities to accurately evaluate the Company's

financial health and trajectory. As LifeMD has conceded, throughout the Class Period, it lacked the ability to do so during the Class Period. Still, the Defendants pushed false and misleading financials to investors in support of a misleading profitability narrative.

4. On March 10-11, 2025, for example, the Defendants made several public statements in SEC filings, investor presentations, and calls with investors concerning the Company's purportedly "record" fourth quarter and full-year 2024 results. On the back of this purportedly record quarter, the Defendants projected that in 2025, the Company would bring in between $265-$275 million in total revenue and $30-$32 million in Adjusted EBITDA ("Earnings Before Interest, Taxes, Depreciation, and Amortization.") The Defendants publicized these projections. Additionally, they proclaimed that the Company was "***well positioned for another year of record growth and profitability.***" This purportedly positive news excited investors. Analysts reacted positively. And LifeMD's stock price rose 31% on this news.

5. On May 6, 2025, the Defendants announced the moment that investors had been hoping for: specifically, that LifeMD had achieved its "***first-ever quarter of GAAP profitability***" in Q1 2025. Additionally, the Defendants raised their prior full-year "***conservative***" guidance based on this purported milestone, revising revenue up "in the range of $268 to $275 million, up from $265 to $275 million, and adjusted EBITDA in the range of $31 to $33 million, up from $30 to $32 million." Several analysts celebrated the good news, with one financial author writing that "It looks as if LifeMD is starting an acute growth inflection that could dramatically change how the Street's outlook is going forward."

6. But as the market would soon learn, the "first-ever quarter of GAAP profitability" that the Defendants trumpeted on May 6, 2025 never occurred, and the Defendants had raised their guidance based on a profitability milestone they had cause to suspect did not actually exist.

7. On November 17, 2025, LifeMD revealed in its quarterly SEC filings that its prior financial statements contained cumulative accounting misstatements spanning fiscal years 2022 through the first half of 2025. For example, for the first quarter of the year net income was revised downward by $1.57 million, ***converting the profits the Company previously touted into a loss***. Earnings per share ***flipped*** from positive ***$0.01 to negative $0.02***. The entire premise of the May 6 guidance raise—the achievement of GAAP profitability—was false.

8. The Company's own revision tables, filed in November 2025, demonstrate the magnitude of Defendants' misstatements. Among other things, the Company conceded that:

- Despite pushing multiple soundbites in press releases, investor calls, and SEC filings that LifeMD had turned the corner on profitably, LifeMD had not generated an operating profit in a reportable fiscal quarter to date. It had generated more losses.
- LifeMD had repeatedly overstated its operating income. For example, for the six-month period ending on June 30, 2025, LifeMD overstated its operating income by ***more than 300%***. Additionally, after revision, LifeMD's net income flipped from a $346,850 profit to a $766,522 loss.

9. Additionally, LifeMD revealed that the "record" results that the Defendants had previously touted in March and May 2025 were misstated across virtually every financial statement line item of significance to investors. The unaudited revision tables that the Defendants included in their November 2025 quarterly report to the SEC showed that LifeMD had falsely recognized $3.61 million in telehealth revenues, $3.61 million in total revenues, and $3.61 million in gross profits. Additionally, the Defendants' revision reported that LifeMD had incurred $2.13 million (over 10%) more in net losses, meaning LifeMD lost substantially more money than the

Defendants reported. GAAP loss per share worsened from the reported ($0.53) to ($0.60), a 12% deterioration.

10. LifeMD's balance sheets required equally sweeping corrections. After revisions, LifeMD's total liabilities for 2024 increased by $7.15 million; its accumulated deficit worsened by $3.6 million; and its stockholders' deficit deepened by $3.5 million. While the adjustments have not been calculated by Defendants, non-GAAP adjusted EBITDA and adjusted EPS, as originally reported and highlighted, they would appear to have been reduced by 25% (from $14.4M to $10.8M) and 26% (from $0.35 to $0.26) respectively. The results for Q4 2004 as originally reported, appear even worse. Adjusted EBITDA would have been reduced by $4.8M (52.9%), from $9.0M to $4.2M, and Q4 2024 adjusted EPS would have been reduced by ~$0.11 (52%), from $0.21 to ~$0.10. For Q1 2025, Telehealth adjusted EBITDA would have dropped about 30% as originally reported from $5,305,741 to $3737,259. When a company's revenue, gross profit, net loss, liabilities, adjusted EBITDA and EPS, and stockholders' equity all require material revision, the original financial statements were not merely inaccurate—they painted a fundamentally misleading picture of the company's financial health.

11. LifeMD further claimed that, quarter after quarter, it had recorded revenue from its third-party pharmacy providers as if LifeMD were a principal, when in reality, LifeMD acted as an agent (a dynamic, if true, that deserves a well-known different accounting treatment). It should have been recording revenue as an agent—systematically overstating its top line. Specifically, the Company claimed the restatement revisions impacted "***the calculation of revenue, deferred revenue, accounts receivable and accrued expenses***," and specifically included revisions "***related to the recording of net revenue as agent in certain arrangements with the Company's third-party pharmacy providers.***" As explained in more detail below, determining whether a company

acted as an agent versus as a principal is a fundamental revenue recognition question under GAAP. This is because the difference in role has significant impacts on a company's revenues and profitability. When a company acts as an agent, it reports only its commission or fee as revenue; when it acts as a principal, it reports the gross transaction amount. In its original statements, LifeMD, based on its representations, had reported revenues related to its third-party pharmacy providers as if LifeMD were a principal—thus systematically overstating its top and bottom line. Simply put, these were not computational misstatements; they were fundamental misapplication of accounting standards that persisted across quarterly and annual periods from 2022 through June 2025.

12. The collapse of the Defendants' guidance confirms the significance of their misstatements. On May 6, 2025, the Defendants raised telehealth Adjusted EBITDA guidance to exceed $21 million on the narrative of a record-breaking quarter. By August 5, 2025 (before the Defendants told the market they would need to restate their financials), the Defendants decreased their Adjusted EBITDA guidance by 33% to $14-$16 million. Similarly, in May, the Defendants projected that their telehealth revenues for the year would be around $208-$213 million. Yet on August 5, 2025, they decreased this guidance point to $195-$200 million, and in November, dropped this to $192-$193 million. Consolidated Adjusted EBITDA guidance, which the Defendants had raised to $31-$33 million in May, collapsed to $13.5-$14.5 million by November—a decline of more than 55%.

13. Ample evidence supports a strong inference that the Defendants knew, or were deliberately reckless in not knowing, that their statements were false when made. First, LifeMD entered 2025 with acknowledged material weaknesses in internal control over financial reporting that directly implicated the reliability of its revenue recognition. The Company's own auditors

issued an "Adverse Opinion on Internal Control over Financial Reporting" attached to LifeMD's 2024 Annual Report, which identified deficiencies in information technology general controls, review of third-party SOC reports, and controls over Information Produced by the Entity. LifeMD disclosed nearly the same weaknesses in prior years, Yet in May, the Defendants affirmatively represented that management had reviewed these weaknesses and "implemented remediation measures to address these material weaknesses, including enhancements to our ITGC controls, additional monitoring procedures, enhancements to our IPE and evidence of formal review and approval procedures, and further training." Additionally, the Defendants stated they believed "these enhancements have strengthened [LifeMD's] internal controls and addressed the root cause of the material weaknesses," at the same time they represented to the public that LifeMD was "well positioned" for record growth and profitability.

14. Defendant's knowledge or awareness of the issues surrounding its financial reporting and internal controls is unquestionable. As LifeMD's CFO, Defendant Benathen had granular, hands-on knowledge of the precise accounting that failed. He further demonstrated this knowledge in statements to investors during earnings calls. For LifeMD's Q2 2023 earnings call, for example, Benathen told investors that the Company was "actually building up a pretty healthy deferred revenue balance" and that LifeMD deferred revenue[2] "down to the day." Benathen and Schreiber also signed SOX certifications for LifeMD's quarterly and annual filings with the SEC, thereby personally attesting to the accuracy of LifeMD's financial statements and the effectiveness of internal controls under Sections 302 and 404 of the Sarbanes-Oxley Act of 2002 ("SOX"). This

---

[2] Per LifeMD's Annual report: "The Company records deferred revenues when cash payments are received or due in advance of its performance."

supports a strong inference that he knew or recklessly disregarded that LifeMD's revenue recognition was materially misstated.

15. Second, LifeMD's extraordinary auditor turnover further suggests the Defendants knew or were aware that the Company's declared financial figures were unreliable, and thus potentially erroneous, at the same time they were touting record-breaking quarters and increasing their guidance. In 2025, the Company cycled through three independent auditors. On April 24, 2025, LifeMD dismissed Marcum LLP and appointed CBIZ CPAs P.C. as its new independent auditor. But less than four months later, on August 15, 2025, LifeMD dismissed CBIZ ***after*** CBIZ had identified material weaknesses in internal controls over financial reporting, specifically concerning information technology general controls and business process controls, but ***before*** the firm could issue any audit report on the periods at issue. Three days later, LifeMD appointed PricewaterhouseCoopers LLP. When LifeMD announced the need to revise three years of financial statements in November 2025, PwC had been engaged for fewer than ninety days. The timing of CBIZ's dismissal—before completing any audit work during the very quarters later revealed to require revision—strongly supports the inference that the Defendants were aware of accounting issues and sought to manage the timing and manner of their disclosure.

16. Finally, the Defendants' trading patterns for LifeMD's corporate insiders are highly suspicious. As detailed further below, public records show that no LifeMD officer or director had ever sold any LifeMD stock before December 2024 (the last month covered by the Defendants' first false statement). To the contrary, LifeMD directors had collectively purchased nearly $4 million of Company stock. This pattern reversed dramatically during the Class Period. Defendant Schreiber sold 300,000 shares for total proceeds of $2,143,279. This was more cash than he had received from LifeMD in base pay and performance bonuses for the prior four years combined.

Defendant Benathen similarly had never sold a single share of LifeMD stock in his four years as CFO. Yet on June 16, 2025, Benathen sold nearly 125,000 shares for over $1,682,440. His sales on that single day constituted approximately one-quarter of his total equity holdings in LifeMD and represented 7% of all LifeMD shares traded on NASDAQ that day. The magnitude of Benathen's single-day sale exceeded his base salary for more than two years.

17. The truth emerged through a series of corrective disclosures that devastated LifeMD's stock price. On August 5, 2025, when LifeMD slashed its full-year guidance and disclosed operational problems it had previously concealed, the stock fell 44.8% in a single day. On November 5, 2025, when the Company announced it had identified $4.6 million in improperly recognized revenue requiring multi-year revisions, the stock fell another 3.7%. On November 12, 2025, when LifeMD filed a Form 12b-25 confirming it could not file its quarterly report on time due to the complexity of the required revenue corrections, the stock fell 8.9%. And on November 17, 2025, when the delayed 10-Q revealed the full scope of the misstatements—including the profit-to-loss reversal in Q1 2025 and the 300%+ operating income overstatement for H1 and H2 2025—the stock fell another 13.5%, closing at $4.09.

18. Plaintiff brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 to recover damages caused by the Defendants' violations on behalf of all persons who purchased LifeMD common stock during the Class Period and were damaged thereby.

## II. JURISDICTION AND VENUE

19. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

21. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

22. In connection with the acts, conduct and other wrongs alleged in this complaint, the Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

### A. Plaintiff

23. Lead Plaintiff, Gehui Zhao, as set forth in the certification. previously filed and incorporated by reference herein, purchased LifeMD securities during the Class Period and was economically damaged thereby.

### B. The Corporate Defendant

24. Defendant LifeMD Inc. is a provider of virtual primary care, which LifeMD is incorporated in Delaware and has its head office at 236 Fifth Avenue, Suite 400, New York, NY 10001. LifeMD's common stock trades on The Nasdaq Global Market ("NASDAQ") under the ticker symbol "LFMD."

25. LifeMD is a direct-to-patient telehealth company providing virtual and in-home healthcare. The LifeMD telehealth platform integrates a 50-state medical group, a nationwide pharmacy network, a wholly owned affiliated commercial pharmacy, nationwide laboratory and diagnostic testing capabilities, a fully integrated electronic medical records ("EMR") system and a patient care and service call center. These capabilities are integrated by a proprietary telehealth

technology that supports a broad range of primary care, chronic disease and lifestyle healthcare needs. As of December 31, 2024, LifeMD claims to have treated approximately 275,000 active patient subscribers across a range of their medical needs including primary care, men's sexual health, weight management, sleep, hair loss and hormonal therapy by providing telehealth clinical services and prescription and over-the-counter ("OTC") treatments, as medically appropriate. The Company's virtual primary care services are primarily offered on a subscription basis.

26. Of its several segments, LifeMD's primary growth driver is its weight management program, known as GLP-1 Focus. Launched in April 2023, the program offers subscribing patients a range of weight loss services including prescriptions for GLP-1 medications like Ozempic, Wegovy, and Zepbound. LifeMD focuses on making these medications more accessible to individuals who can self-pay for these medications or can otherwise get coverage from their health insurance providers. At present, the subscription owed to LifeMD for access to these medications is around $149 per month. Patients approved for pharmaceuticals are required to pay additional costs for those items.

27. In addition to its Weight Management Programs, LifeMD has also expanded into providing telehealth services in the high-demand, specialized areas of men's, women's, and behavioral health. The Rex MD segment, for example, is an online platform focused on providing convenient, discreet, and direct-to-consumer services for certain men's health conditions (e.g., erectile dysfunction, hair loss) without requiring in-person doctor visits. The Women's Health program, by comparison, specializes in providing expert-guided Hormone Replacement Therapy ("HRT") for menopause and perimenopause, as well as covering symptoms like fatigue, weight gain, and low libido, and is expanding to cover broader wellness needs. For both programs, a LifeMD partner pharmacy will dispense and ship prescription medications and OTC products

directly to the customer, if appropriate, after treatment from a LifeMD affiliated licensed physician. These programs incur subscription fees between $19 a month to $199 month based on the membership services selected.

**C. The Individual Defendants**

28. Defendant Justin Schreiber ("Schreiber") served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") at all relevant times. Schreiber has served as Chairman of the Board since 2019 and Chief Executive Officer of the Company since 2022. He joined the Board in 2018, and he was formerly President of the Company from 2018 to 2021. Schreiber has also served as President of LifeMD PR, LLC, the Company's wholly owned subsidiary in Puerto Rico ("LifeMD PR"), since 2017. Before joining LifeMD, Schreiber amassed significant experience working with investors and capital markets as the founder of an investment firm focused on venture and growth stage businesses in the healthcare and technology sectors, as well as the founder of a consulting business that provided investor relations, advisory services, and capital raising solutions to small publicly traded companies. He holds a B.S. in International Business from Elizabethtown College and a B.A. in International Management from the ICN École de management in Nancy, France.

29. Defendant Marc Benathen ("Benathen") has served as the Company's Chief Financial Officer at all relevant times. Marc Benathen was appointed Chief Financial Officer of the Company in 2021. Mr. Benathen has over 18 years of financial, strategy, direct-to-consumer, and operating leadership experience. Previously, he had been involved in six companies across the consumer, technology, and media industries, holding positions including Chief Financial Officer, Vice President, and Director. Mr. Benathen holds a B.B.A. in Finance (Honors) from Baruch College.

30. Defendants Schreiber and Benathen are collectively referred to herein as the "Individual Defendants."

31. Each of the Individual Defendants signed each 10-K and 10-Q, and the SOX certifications for LifeMD's attached to each 10-K and 10-Q filing in the Class Period, thereby personally attesting to the accuracy of LifeMD's financial statements and the effectiveness of internal controls under Sections 302 and 404 of the Sarbanes-Oxley Act of 2002 and:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

32. LifeMD is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

33. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to LifeMD under *respondeat superior* and agency principles.

34. Defendant LifeMD and the Individual Defendants are collectively referred to herein as the "Defendants."

## IV. BACKGROUND ON ACCOUNTING PRINCIPLES

### A. The Principal vs. Agent Failure (ASC 606)

35. Throughout the Class Period, the Defendants knowingly or recklessly inflated LifeMD's top and bottom-line growth and manufactured a narrative of "breakout" profitability by systematically violating fundamental accounting principles governing revenue recognition. Central to understanding this deception was the Company's improper application of Principal versus Agent accounting under ASC 606.[3] The improper application of this standard allowed LifeMD to report millions of dollars in pharmacy-related revenue on a gross and net basis when it was, in fact, merely acting as an intermediary. By recording the full-face value of transactions—where LifeMD held no inventory risk and exercised no control over the underlying goods—the Company presented an illusory version of its economic health. This was not a mere technical oversight but a foundational misrepresentation that enabled the Company to claim its first-ever quarter of GAAP profitability in early 2025—a milestone that the Defendants—as the Defendants would later admit resulted from the "recording of net revenue as agent in certain arrangements with the Company's third-party pharmacy providers".

36. The distinction between Principal and Agent accounting is a cornerstone of GAAP designed to prevent exactly the type of revenue bloating seen here. Under U.S. GAAP, specifically

[3] Larsen Certifed Public Accountants, *ASC 606 Revenue Recognition: Am I an agent or a principal and why does it matter?*(Oct. 11, 2029), https://larsco.com/blog/asc-606-revenue-recognition-am-i-an-agent-or-a-principal-and-why-does-it-matter; Deloitte, *10.2 Determining Whether an Entity is Acting as a Principal,* ACCOUNTING RESEARCH TOOL, https://dart.deloitte.com/USDART/home/codification/revenue/asc606-10/roadmap-revenue-recognition/chapter-10-principal-versus-agent-considerations/10-2-determining-whether-an-entity(last accessed Jan. 29, 2026); Deloitte, *Revenue Recognition — Evaluating Whether an Entity Is Acting as a Principal or as an Agent*, ACCOUNTING SPOTLIGHT (May 28, 2019), https://dart.deloitte.com/USDART/home/publications/archive/deloitte-publications/accounting-spotlight/2019/revenue-recognition-evaluating-whether-an-entity.

ASC 606, an entity must determine whether it acts as a Principal (reporting revenue gross) or an Agent (reporting revenue net). Under the ASC 606 framework, an entity acts as a Principal if it controls a promised good or service before transferring it to the customer, requiring it to report revenue on a "gross" basis—reflecting the total amount billed. Conversely, an entity acts as an Agent if its only performance obligation is to arrange for the provision of goods by another party, in which case it must report revenue on a "net" basis, reflecting only the commission or fee retained.

- Principal: The entity controls the specified good or service before it is transferred to the customer. Indicators of control include primary responsibility for fulfillment, inventory risk, and discretion in establishing pricing.
- Agent: The entity's obligation is to arrange for the provision of goods or services by another party. The revenue recognized is the "net" amount (commission or fee) retained after paying the supplier.

37. As discussed in Part V below, in November 2025, LifeMD admitted that it had cumulatively over-recognized at least $4.6 million in gross and net revenues. This suggests that for years, LifeMD booked the full-face value of prescriptions or services where it merely acted as a facilitator.

38. By inflating the top line, the Company artificially depressed its optical valuation multiples (e.g., Enterprise Value / Revenue). A valuation multiple is simply a financial ratio used by analysts and investors to estimate a company's value by comparing its market value or transaction price to a specific performance metric, such as revenue or earnings. These ratios enable "apples-to-apples" comparisons between similar companies, providing a quick benchmark based on industry norms and market conditions. They are also used to gauge how much investors are

willing to pay for a company's earnings, cash flow, or other performance metrics, as well as whether a company is undervalued or overvalued based on prevailing market norms.

39. As applied to LifeMD, by inflating the top and bottom-line, the Defendants made the price for LifeMD stock appear cheaper (i.e. undervalued) and the growth trajectory steeper than the economic reality.

40. The impact of this accounting artifice was material and devastating to the integrity of the Company's financial reporting. By inflating the top line through the improper use of principal accounting, the Company had effectively created a "pure profit" mirage. Because the overstated revenue had little corresponding actual costs attached to it in the Company's ledger, the majority of every dollar of improperly recognized revenue flowed directly to the bottom line, allowing management to manufacture a false narrative of operational efficiency that did not exist.

### B. The Criteria for Evaluating the Materiality of Restated Financials Under SEC Staff Accounting Bulletin No. 99

41. SEC Staff Accounting Bulletin No. 99 ("SAB 99")[4] expressly prohibits the use of "rules of thumb" or purely numerical thresholds to justify the omission of misstatements. For example, SAB 99 rejects the "rule of thumb" that "[a] misstatement or omission of an item that falls under a 5% threshold is not material in the absence of particularly egregious circumstances, such as self-dealing or misappropriation by senior management." As the SEC staff notes, "exclusive reliance on . . . any percentage or numerical threshold has no basis in the accounting literature or the law." Instead, the Bulletin directs an evaluation of the "total mix" of information, emphasizing that qualitative factors may render a numerically small misstatement material to a reasonable investor.

---

[4] SEC Staff Accounting Bulletin No. 99 – Materiality (Aug. 1999), https://www.sec.gov/interps/account/sab99.htm.

42. Among the specific qualitative considerations listed in SAB 99 to be evaluated in a materiality analysis is "whether the misstatement changes a loss into income or vice versa." Others listed in the bulletin include:

- whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate
- whether the misstatement masks a change in earnings or other trends
- whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise
- whether the misstatement changes a loss into income or vice versa
- whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability
- whether the misstatement affects the registrant's compliance with regulatory requirements
- whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements
- whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation
- whether the misstatement involves concealment of an unlawful transaction.

43. SAB 99 goes on to note that the above is "not an exhaustive list of the circumstances that may affect the materiality of a quantitatively small misstatement."

> Among other factors, the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material. Consideration of potential market reaction to disclosure of a misstatement is by itself 'too blunt an instrument to be depended on' in considering whether a fact is material. When, however, management or the independent auditor expects (based, for example, on a pattern of market performance) that a known misstatement may result in a significant positive or

negative market reaction, that expected reaction should be taken into account when considering whether a misstatement is material.

44. As discussed further in Part VII, *infra*, materiality is clearly shown. For example, as shown below, in the 2024 fiscal year, LifeMD understated its operating loss, amongst other key financial indicators, by 12%. Then, for Q1 it overstated its net income attributable to LifeMD, flipping a profit to a loss.

## V. THE MATERIALLY FALSE AND MISLEADING STATEMENTS AT ISSUE

45. The Class Period begins on March 10, 2025. On that date, the Defendants knowingly or recklessly began making false or misleading public statements concerning the Company's record-breaking financials. As discussed below, these statements were indisputably false and have since been corrected by the Company.

### A. March 10, 2025 – Press Release Announcing Fourth Quarter FY2025 Results

46. On March 10, 2025, LifeMD issued a press release after markets had closed titled "LifeMD Reports Fourth Quarter 2024 Results," featuring quotes from both Defendant Shreiber and Defendant Benathen. LifeMD also fled this press release with the SEC on Form 8-K. Therein, LifeMD emphasized that it had beat its top-line and bottom-line estimates for the fourth quarter of 2024. Specifically, the Company declared that for the fourth quarter 2024, as compared to its fourth quarter in the prior year, the Company reported it had:

> ● ***Consolidated revenue increased 43% to $64.3 million with telehealth revenue up 60%.***
>
> …
>
> ● ***Gross margin was 85% compared with 88% due to one-time start-up costs with a new pharmacy and revenue mix changes.*** We expect gross margin to return to a range of 88% to 90% in 2025.
>
> ● ***GAAP net loss was $0.9 million or $0.02 per share, compared with $4.5 million or $0.12 per share.***

● ***Adjusted EBITDA was $9.0 million compared with $5.0 million (see definition below of this non-GAAP financial measure and reconciliation to GAAP***).

● ***The telehealth business achieved adjusted EBITDA profitability of $5.9 million compared with $1.2 million (see definition below of this non-GAAP financial measure and reconciliation to GAAP).***

● ***Adjusted diluted EPS[5] was $0.21 compared with $0.14***.

47. These statements were false and misleading. As LifeMD later conceded in its November 2025 SEC filings, the financial metrics reported in these figures failed to correct for (or relied on metrics that failed to correct for) misstatements identified associated with the calculation of revenue, deferred revenue, accounts receivable and accrued expenses and previously identified out-of-period adjustments. These misstatements originated in 2023 and 2024, meaning the Defendants relied on inaccurate data when making the false statements identified above. Among other things, LifeMD had to later revise its telehealth revenue for 2024 downward by $3.6 million, reduce its gross profit by $3.61 million, and increase its net losses by $2.13 million.[6] Put simply, growth was overstated. The full list of corrected metrics is provided in LifeMD's restatement, as well as in the tables in Part VII, below.

48. Additionally, for the full fiscal year, as compared to the full year of 2023, the Company reported that:

---

5 EPS means earnings per share.

6 Adjusted EBITDA, while not recalculated by Defendants, would likely be overstated by the same absolute amount as the operating loss based on the information provided by Defendants. Defendants, non-GAAP adjusted EBITDA and adjusted EPS, as originally reported and highlighted, would appear to have to be reduced by 25% (from $14.4M to $10.8M) and 26% ( from $0.35 to $0.26) respectively. The results for Q4 2004 as originally reported, appear even worse. Adjusted EBITDA would have been reduced by $4.8M (52.9%), from $9.0M to $4.2M, and Q4 2024 adjusted EPS would have been reduced by ~$0.11 (52%), from $0.21 to ~$0.10.

***● Consolidated revenue increased 39% to $212.5 million with telehealth revenue up 61%.***

***● Gross margin was 89% compared with 88%.***

***● GAAP net loss was $22.0 million or $0.53 per share, compared with $23.7 million or $0.70 per share.***

***● Adjusted EBITDA was $14.4 million compared with $11.2***

***● The telehealth business achieved adjusted EBITDA of $7.4 million compared with a loss of $5.2 million.***

***● Adjusted diluted EPS was $0.35 compared with $0.32.***

49. These statements were false and misleading. As LifeMD later conceded in its November 2025 SEC filings, the financial metrics reported in these figures failed to correct for (or relied on metrics that failed to correct for) misstatements identified associated with the calculation of revenue, deferred revenue, accounts receivable and accrued expenses and previously identified out-of-period adjustments. These misstatements originated in 2023 and 2024, meaning the Defendants relied on inaccurate data when making the false statements identified above. Among other things, LifeMD had to later revise its telehealth revenue for 2024 downward by $3.61 million, reduce its gross profit by $3.61 million, and increase its net losses by $2.13 million. Put simply, growth was overstated. The full list of corrected metrics is provided in LifeMD's restatement, as well as in the tables in Part VII, below.

50. In the press release, the Company also initiated financial guidance for Q1. and FY25.

For the first quarter of 2025, the Company expects:

- Total revenue in the range of $61 million to $63 million vs. consensus of $59.62 million, with telehealth revenue in the range of $48 million to $49 million.

> - Adjusted EBITDA in the range of $5 million to $7 million, with telehealth adjusted EBITDA in the range of $3 million to $4 million.
>
> For the full year 2025, the Company expects:
>
> - Total revenue in the range of $265 million to $275 million vs. consensus of $259.09M, with telehealth revenue in the range of $205 million to $213 million.
>
> - Adjusted EBITDA in the range of $30 million to $32 million, with telehealth adjusted EBITDA of approximately $20 million.

51. These statements were false and misleading. In particular, the Defendants lacked a reasonable basis or were reckless in providing the above quoted guidance because the Defendants relied on misstated 2023 and 2024 financials and nevertheless issued the guidance despite knowing of material weaknesses in the Company revenue-related controls. LifeMD had disclosed material weaknesses in ITGCs, IPE, SOC review, and review/approval of key financial information. As LifeMD's November disclosures confirm, these weaknesses—which existed during 2023 to 2024 audits—directly affected revenue recognition in contrast to managements representation.

52. The press release included quotes from management, with Defendant Schreiber stating:

> ***LifeMD had a great fourth quarter. We not only achieved record quarterly revenue and adjusted EBITDA but continued to accelerate growth across our core telehealth brands.*** We are especially pleased with the growth of our weight management program. While GLP-1 market dynamics continue to change with semaglutide coming off shortage, the quality of synchronous care we provide positions and differentiates LifeMD.

53. These statements were false and misleading. As LifeMD later conceded in its November 2025 SEC filings, the financial metrics reported in these figures failed to correct for (or relied on metrics that failed to correct for) misstatements identified associated with the calculation of revenue, deferred revenue, accounts receivable and accrued expenses and previously identified

out-of-period adjustments. These misstatements originated in 2023 and 2024, meaning the Defendants relied on inaccurate data when making the false statements identified above. The "record" results LifeMD and Schreiber touted were later revised downward, showing they were inflated by accounting misstatements. These downward revisions confirmed, among other things, that 2024 revenue, net income and EBITDA were overstated.

54. The press release also quoted Defendant Benathen stating:

> ***LifeMD had an exceptionally strong quarter with top- and bottom-line growth led by our core telehealth business***. ***Telehealth achieved 60% year-over-year growth*** on a standalone basis, while ***our telehealth adjusted EBITDA increased 396% to $5.9 million. Our consolidated adjusted EBITDA was a record $9.0 million.... We entered 2025 well positioned for another year of record growth and profitability***. As such, we are introducing 2025 guidance for consolidated revenue of $265 million to $275 million and consolidated adjusted EBITDA of $30 million to $32 million."

55. These statements were false and misleading. As LifeMD later conceded in its November 2025 SEC filings, the financial metrics reported in these figures failed to correct for (or relied on metrics that failed to correct for) misstatements identified associated with the calculation of revenue, deferred revenue, accounts receivable and accrued expenses and previously identified out-of-period adjustments. These misstatements originated in 2023 and 2024, meaning the Defendants relied on inaccurate data when making the false statements identified above. The "exceptionally strong" results LifeMD and Benathen touted were later revised downward, showing they were inflated by accounting misstatements. These downward revisions confirmed, among other things, that 2024 revenue, net income and adjusted EBITDA were overstated. Additionally, LifeMD was not "well positioned for another year of . . . profitability." It was operating under severe internal-control weaknesses and operational instability that later forced a guidance cut. Refund spikes, RexMD instability, and fulfillment/pharmacy issues were later cited as reasons for

the August guidance cut. And after adjustment, LifeMD had failed to achieve the milestone of GAAP profitability.

**B. March 10, 2025 – Investor Presentation**

56. On March 10, 2025, the Defendants also posted an Investor Presentation on the Company's website after markets had closed. Defendant Schrieber referred to this Presentation in the Fourth Quarter 2024 Earnings Call LifeMD held with investors and analysts (see Part C, *infra*), also after markets had closed. The presentation reiterated the $265M-$275M revenue guidance and $30-$32 of Adjusted EBITA forecast for 2025 discussed above. The presentation also represented that LifeMD had seen "substantial growth in . . . profitability," "Rapid and sustainable profitability growth in our core telehealth business," "rapidly expanding telehealth gross margins," and positive non-GAAP EBITDA as depicted in the following slides:



## Our businesses have experienced rapid, consecutive YoY Growth

**$270M**
2025E Revenue Forecast

**27%**
Forecast 2025 Growth Rate Versus 2024

**1.1M+**
Patients & Customers To-Date




## Rapid and sustainable profitability growth in our core telehealth business

Annual telehealth adjusted EBITDA ($ millions)



## Rapidly expanding telehealth gross margins and ad spend leverage driven by patient retention are driving telehealth profitability growth







## 2025 guidance reflects substantial growth in revenue and profitability

| | FY 2025 GUIDANCE | FY 2024 ACTUAL | DELTA |
|---|---|---|---|
| Telehealth Revenue | $205 to $213 million | $158 million | +29 to +34% |
| WorkSimpli Revenue | $60 to $62 million | $54 million | +11% to +15% |
| Consolidated Revenue | $265 to $275 million | $212 million | +25% to +30% |
| Telehealth Adjusted EBITDA | $20 million | $7 million | +170% |
| WorkSimpli Adjusted EBITDA | $10 to $12 million | $7 million | +43% to +71% |
| Consolidated Adj. EBITDA | $30 to $32 million | $14 million | +108% to +122% |

## Reconciliation of GAAP Net Loss to Adjusted EBITDA (in whole numbers, unaudited)

| | Fourth Quarter Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| Net loss attributable to common shareholders | $ (882,834) | $ (4,508,664) | $ (21,987,982) | $ (23,702,242) |
| Interest expense (excluding amortization of debt discount) | 513,630 | 522,241 | 1,780,042 | 1,755,656 |
| Depreciation, amortization and accretion expense | 2,547,095 | 1,959,468 | 9,505,166 | 6,767,447 |
| Amortization of debt discount | 100,444 | 100,444 | 401,775 | 333,939 |
| Loss on debt extinguishment | - | - | - | 325,198 |
| Financing transactions expense | 13,125 | 38,431 | 336,497 | 773,932 |
| Litigation costs [(a)] | 376,030 | 168,600 | 1,698,531 | 1,594,930 |
| Severance costs | 56,403 | 17,400 | 1,198,471 | 25,092 |
| Acquisitions expenses | 537,662 | 30,909 | 537,662 | 158,047 |
| Insurance acceptance readiness | 92,661 | 252,250 | 1,454,298 | 318,884 |
| Sarbanes Oxley readiness | 134,891 | 151,248 | 521,361 | 199,824 |
| Accrued interest on Series B Convertible Preferred Stock | - | - | - | 506,991 |
| Foreign exchange loss | 246,538 | 368,793 | 1,154,954 | 1,165,412 |
| Taxes | 1,023,872 | 428,000 | 2,285,425 | 498,378 |
| Dividends | 776,562 | 1,363,560 | 3,106,250 | 5,227,450 |
| Stock-based compensation expense | 3,104,956 | 3,645,607 | 12,234,797 | 12,489,343 |
| Net income attributable to noncontrolling interests | 340,963 | 509,880 | 153,234 | 2,756,935 |
| Consolidated Adjusted EBITDA | $ 8,981,997 | $ 5,048,167 | $ 14,380,480 | $ 11,195,216 |

(a) For the quarter and year ended December 31, 2024, the Company included litigation costs related to a class action complaint alleging, inter alia, unauthorized disclosure of certain information of class members to third parties (the Marden v. LifeMD, Inc. case), as disclosed in the Company's Form 10-K for the year ended December 31, 2024 and a heavily negotiated executive separation agreement. For the quarter and year ended December 31, 2023, the Company included litigation costs related to a purported breach of an investment bank engagement concerning potential debt financing (the William Blair LLC v. LifeMD, Inc. case) and a purported breach of a consulting services agreement for strategic and corporate development services (the Harborside Advisors LLC v. LifeMD, Inc. case), as disclosed in the Company's Form 10-K for the fiscal year ended December 31, 2023 and filed on March 11,

## Reconciliation of Telehealth GAAP Operating Loss to Telehealth Adjusted EBITDA (in whole numbers, unaudited)

| | Fourth Quarter Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| Telehealth operating loss | $ (92,328) | $ (4,401,440) | $ (16,787,433) | $ (25,261,021) |
| Depreciation, amortization and accretion expense | 1,647,085 | 1,280,032 | 6,203,006 | 4,456,393 |
| Financing transactions expense | 13,125 | 38,431 | 336,497 | 773,932 |
| Litigation costs [(a)] | 376,030 | 168,600 | 1,698,531 | 1,594,930 |
| Severance costs | 56,403 | 17,400 | 1,198,471 | 25,092 |
| Acquisitions expenses | 537,662 | 30,909 | 537,662 | 158,047 |
| Insurance acceptance readiness | 92,661 | 252,250 | 1,454,298 | 318,884 |
| Sarbanes Oxley readiness | 134,891 | 151,248 | 521,361 | 199,824 |
| Stock-based compensation expense | 3,104,956 | 3,645,607 | 12,234,797 | 12,489,343 |
| Telehealth Adjusted EBITDA | $ 5,870,484 | $ 1,183,037 | $ 7,397,189 | $ (5,244,576) |

(a) For the quarter and year ended December 31, 2024, the Company included litigation costs related to a class action complaint alleging, inter alia, unauthorized disclosure of certain information of class members to third parties (the Marden v. LifeMD, Inc. case), as disclosed in the Company's Form 10-K for the year ended December 31, 2024 and a heavily negotiated executive separation agreement. For the quarter and year ended December 31, 2023, the Company included litigation costs related to a purported breach of an investment bank engagement concerning potential debt financing (the William Blair LLC v. LifeMD, Inc. case) and a purported breach of a consulting services agreement for strategic and corporate development services (the Harborside Advisors LLC v. LifeMD, Inc. case), as disclosed in the Company's Form 10-K for the fiscal year ended December 31, 2023 and filed on March 11, 2024.

57. These statements were false and misleading. As LifeMD later conceded in its November 2025 SEC filings, the financial metrics reported in these figures failed to correct for (or relied on metrics that failed to correct for) misstatements identified associated with the calculation

of revenue, deferred revenue, accounts receivable and accrued expenses and previously identified out-of-period adjustments. These misstatements originated in 2023 and 2024, meaning the Defendants relied on inaccurate data when making the false statements identified above. The purportedly strong results touted were later revised downward, showing they were inflated by accounting misstatements. These downward revisions confirmed, among other things, that 2024 revenue, net income and adjusted EBITDA were overstated. Additionally, despite suggestions to the contrary, LifeMD had not yet achieved "sustained profitability." It was operating under severe internal-control weaknesses and operational instability that later forced a guidance cut. Refund spikes, RexMD instability, and fulfillment/pharmacy issues were later cited as reasons for the August guidance cut. And after adjustment, LifeMD had failed to achieve the milestone of GAAP profitability.

58. Additionally, the Defendants lacked a reasonable basis in providing the guidance shown above because the Defendants relied on misstated 2023 and 2024 financials and nevertheless issued the guidance despite knowing of material weaknesses in the Company revenue-related controls. LifeMD had disclosed material weaknesses in ITGCs, IPE, SOC review, and review/approval of key financial information. As LifeMD's November disclosures confirm, these weaknesses—which existed during 2023 to 2024 audits—directly affected revenue recognition in contrast to management's representations.

**C. March 10, 2025 – Investor Call**

59. Also on March 10, 2025, the Company held a conference call with analysts and investors. This call began after markets had closed. During that call, Defendant Benathen discussed the Company's financial results and guidance, stating:

> Thank you, Justin, and good afternoon, everyone. LifeMD achieved very strong fourth quarter performance with consolidated revenue growing 43% versus a year-ago period to $64.3 million. Core telehealth revenue grew by

60% versus the prior year with standalone adjusted EBITDA profitability at $5.9 million, an increase of 396% versus prior year.

Telehealth subscriber growth remained strong with the number of active subscribers increasing 27% year-over-year to over 275,000 at quarter-end. The number of WorkSimpli active subscribers grew by 3% to 164,000. Importantly, WorkSimpli's performance stabilized in Q4 with average monthly adjusted EBITDA returning to over $1 million as we previously guided.

Gross margin for the fourth quarter was 85.3%, a decline of 280 basis points versus prior year, due to changes in revenue mix and one-time impacts related to the onboarding of a new pharmacy. We fully expect gross margin rates to return to their normalized 88% to 90% in 2025. Gross profit was $54.8 million, an increase of 39% from the year-ago period.

***Our GAAP net loss attributable to common stockholders for the fourth quarter was $883,000, or a loss of $0.02 per share. This compares with a GAAP net loss attributable to common stockholders for the fourth quarter of 2023 of $4.5 million, or a loss of $0.12 per share.***

Adjusted EBITDA is a non-GAAP measure we define as income or loss attributable to common shareholders, before various items as outlined in today's earnings news release. ***Adjusted EBITDA totaled $9 million for the fourth quarter as compared with $4 million -- $5 million in the year-ago period***.

Telehealth adjusted EBITDA is a non-GAAP measure defined as adjusted EBITDA for only our telehealth business excluding WorkSimpli. ***This measure was $5.9 million for the fourth quarter of 2024, as compared to $1.2 million in the year-ago period***. We exited the fourth quarter with $35 million in cash.

Now, turning to full-year 2024 results. ***For 2024 consolidated revenue was $212.5 million, an increase of 39% versus 2023. Telehealth revenue grew 61% on a standalone basis. Gross margin for the year was 88.7%, an increase of 110 basis points versus 2023***.

***Our GAAP net loss attributable to common stockholders for 2024 was $22 million, or a loss of $0.53 per share. This compares with the GAAP net loss attributable to common stockholders for 2023 of $23.7 million, or a loss of $0.70 per share. Adjusted EBITDA totaled $14.4 million for 2024, compared with $11.2 million for 2023. Telehealth adjusted EBITDA totaled $7.4 million for the year, as compared with a loss of $5.2 million for 2023***.

Turning to financial guidance. ***Today we are introducing guidance for 2025, consolidated revenue of $265 million to $275 million, with***

> ***telehealth revenue of $205 million to $213 million. We are also introducing consolidated adjusted EBITDA guidance for 2025 of between $30 million and $32 million, with telehealth adjusted EBITDA of approximately $20 million*.**
>
> This wraps up our financial results. I'd now like to turn the call back over to Justin.

60. These statements were false and misleading. As LifeMD later conceded in its November 2025 SEC filings, the financial metrics reported in these figures failed to correct for (or relied on metrics that failed to correct for) misstatements identified associated with the calculation of revenue, deferred revenue, accounts receivable and accrued expenses and previously identified out-of-period adjustments. These misstatements originated in 2023 and 2024, meaning the Defendants relied on inaccurate data when making the false statements identified above. The purportedly strong results touted were later revised downward, showing they were inflated by accounting misstatements. These downward revisions confirmed, among other things, that 2024 revenue, net income and adjusted EBITDA were overstated. Additionally, the Defendants lacked a reasonable basis in providing the guidance above because the Defendants relied on misstated 2023 and 2024 financials and nevertheless issued the guidance despite knowing of material weaknesses in the Company revenue-related controls. LifeMD had disclosed material weaknesses in ITGCs, IPE, SOC review, and review/approval of key financial information. As LifeMD's November disclosures confirm, these weaknesses—which existed during 2023 to 2024 audits—directly affected revenue recognition in contrast to managements representations.

## D. March 11, 2025 – Annual Report for the 2024 Fiscal Year

61. On March 11, 2025, the Company also filed its annual report for the 2024 fiscal year ended December 31, 2024 with the SEC on Form 10-K ("2024 10-K") before or during regular trading hours. Defendants Schreiber and Benathen both signed the filing. Therein, the Company's consolidated financials and statement of operations as follows:

## LIFEMD, INC.
## CONSOLIDATED BALANCE SHEETS

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| **ASSETS** | | |
| Current Assets | | |
| Cash | $ 35,004,924 | $ 33,146,725 |
| Accounts receivable, net | 8,217,813 | 5,277,250 |
| Product deposit | 40,763 | 485,850 |
| Inventory, net | 2,797,358 | 2,759,932 |
| Other current assets | 2,672,231 | 934,510 |
| Total Current Assets | 48,733,089 | 42,604,267 |
| Non-current Assets | | |
| Equipment, net | 1,479,184 | 476,303 |
| Right of use assets | 6,400,596 | 594,897 |
| Capitalized software, net | 13,816,501 | 11,795,979 |
| Intangible assets, net | 2,030,656 | 3,009,263 |
| Total Non-current Assets | 23,726,937 | 15,876,442 |
| Total Assets | $ 72,460,026 | $ 58,480,709 |
| **LIABILITIES, MEZZANINE EQUITY AND STOCKHOLDERS' (DEFICIT) EQUITY** | | |
| **Current Liabilities** | | |
| Accounts payable | $ 16,009,484 | $ 11,084,855 |
| Accrued expenses | 20,811,763 | 13,937,494 |
| Notes payable, net | - | 327,597 |
| Current operating lease liabilities | 508,537 | 603,180 |
| Current portion of long-term debt | 8,444,444 | - |
| Deferred revenue | 14,480,917 | 8,828,598 |
| Total Current Liabilities | 60,255,145 | 34,781,724 |
| Long-term Liabilities | | |
| Long-term debt, net | 9,885,057 | 17,927,727 |
| Noncurrent operating lease liabilities | 6,265,192 | 73,849 |
| Contingent consideration | 100,000 | 131,250 |
| Total Liabilities | 76,505,394 | 52,914,550 |
| Commitments and contingencies (Note 10) | | |
| Mezzanine Equity | | |
| Preferred Stock, $0.0001 par value; 5,000,000 shares authorized Series B Convertible Preferred Stock, $0.0001 par value; 5,000 shares authorized, zero shares issued and outstanding, liquidation value, $0 per share as of December 31, 2024 and 2023 | - | - |
| Stockholders' (Deficit) Equity | | |
| Series A Preferred Stock, $0.0001 par value; 1,610,000 shares authorized, 1,400,000 shares issued and outstanding, liquidation value approximately, $25.55 per share as of December 31, 2024 and 2023 | 140 | 140 |
| Common Stock, $0.01 par value; 100,000,000 shares authorized, 42,293,907 and 38,358,641 shares issued, 42,190,867 and 38,255,601 outstanding as of December 31, 2024 and 2023, respectively | 422,939 | 383,586 |
| Additional paid-in capital | 230,508,339 | 217,550,583 |
| Accumulated deficit | (236,253,218) | (214,265,236) |
| Treasury stock, 103,040 shares, at cost, as of December 31, 2024 and 2023 | (163,701) | (163,701) |
| Total LifeMD, Inc. Stockholders' (Deficit) Equity | (5,485,501) | 3,505,372 |
| Non-controlling interest | 1,440,133 | 2,060,787 |
| Total Stockholders' (Deficit) Equity | (4,045,368) | 5,566,159 |
| Total Liabilities, Mezzanine Equity and Stockholders' (Deficit) Equity | $ 72,460,026 | $ 58,480,709 |

The accompanying notes are an integral part of these consolidated financial statements.

LIFEMD, INC.
CONSOLIDATED STATEMENTS OF OPERATIONS

| | Year Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| **Revenues** | | |
| Telehealth revenue, net | $ 158,438,631 | $ 98,152,919 |
| WorkSimpli revenue, net | 54,015,207 | 54,394,087 |
| Total revenues, net | 212,453,838 | 152,547,006 |
| **Cost of revenues** | | |
| Cost of telehealth revenue | 21,440,799 | 17,480,533 |
| Cost of WorkSimpli revenue | 2,627,680 | 1,419,931 |
| Total cost of revenues | 24,068,479 | 18,900,464 |
| **Gross profit** | 188,385,359 | 133,646,542 |
| **Expenses** | | |
| Selling and marketing expenses | 103,020,025 | 76,451,466 |
| General and administrative expenses | 72,662,021 | 51,694,232 |
| Customer service expenses | 10,217,654 | 7,632,283 |
| Development costs | 9,512,308 | 6,060,513 |
| Other operating expenses | 9,118,032 | 6,297,321 |
| Total expenses | 204,530,040 | 148,135,815 |
| **Operating loss** | (16,144,681) | (14,489,273) |
| Interest expense, net | (2,181,817) | (2,596,586) |
| Loss on debt extinguishment | - | (325,198) |
| **Loss from operations before income taxes** | (18,326,498) | (17,411,057) |
| Income tax provision | (402,000) | (428,000) |
| **Net loss** | (18,728,498) | (17,839,057) |
| Net income attributable to non-controlling interest | 153,234 | 2,756,935 |
| **Net loss attributable to LifeMD, Inc.** | (18,881,732) | (20,595,992) |
| Preferred stock dividends | (3,106,250) | (3,106,250) |
| **Net loss attributable to LifeMD, Inc. common stockholders** | $ (21,987,982) | $ (23,702,242) |
| Basic loss per share attributable to LifeMD, Inc. common stockholders | $ (0.53) | $ (0.70) |
| Diluted loss per share attributable to LifeMD, Inc. common stockholders | $ (0.53) | $ (0.70) |
| Weighted average number of common shares outstanding: | | |
| Basic | 41,196,292 | 33,905,155 |
| Diluted | 41,196,292 | 33,905,155 |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

62. These statements were false and misleading. As LifeMD later conceded in its November 2025 SEC filings, the financial metrics reported in these figures failed to correct for (or relied on metrics that failed to correct for) misstatements identified associated with the calculation of revenue, deferred revenue, accounts receivable and accrued expenses and previously identified out-of-period adjustments. These misstatements originated in 2023 and 2024, meaning the Defendants relied on inaccurate data when making the false statements identified above. Among other things, LifeMD had to later revise its telehealth revenue for 2024 downward by $3.61 million, reduce its gross profit by $3.61 million, and increase its net losses by $2.13 million. Put simply,

growth was overstated. The full list of corrected metrics is provided in LifeMD's restatement, as well as in the tables in Part VII, below.

63. In addition to signing the Annual Report, Defendants Schreiber and Benathen also signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, stating among other things that "[b]ased on their knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and "[b]ased on their knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report." Though the Annual Report acknowledged weaknesses in the Company's internal controls, the Company specifically represented it had undertaken significant remediation efforts to fix these issues. Specifically, the Annual Report reported internal weaknesses related to:

> (i) our information technology general controls ("ITGCs"), particularly in the areas of user access and change management within our information systems and review of key third-party service provider Systems and Organizational Controls ("SOC") reports and (ii) business process controls related to Information Produced by the Entity ("IPE") and system generated IPE and insufficient evidence of formal review and approval procedures of key information utilized in the performance of the control.

However, the Company stated that it had undertaken significant remediation efforts to fix these issues:

> During the year ended December 31, 2024, management implemented remediation measures to address these material weaknesses, including enhancements to our ITGC controls, additional monitoring procedures, enhancements to our IPE and evidence of formal review and approval procedures, and further training. While we believe these enhancements have strengthened our internal controls and addressed the root cause of the material weaknesses, the effectiveness of these newly implemented controls

> has not been tested to conclude that the material weaknesses have been remediated.

Regardless, the Individual Defendants' certifications attested to the accuracy of the Company's financial statements.

64. On this news, LifeMD's stock rose $1.31 or 31% to close at $5.58 per share on March 11, 2025.

**E. May 6, 2025 – Press Release Announcing First Quarter FY2025 Results**

65. On May 6, 2025, while the markets were open, LifeMD issued a press release entitled "LifeMD Reports First Quarter 2025 Results and Raises Full-Year 2025 Guidance" (the "Q1 Release"). The release featured quotes from Defendants Schreiber and Benathen. LifeMD also filed the press release with the SEC on Form 8-K after markets had closed.

66. The Q1 Release quoted Defendant Schreiber as stating the following:

> ***LifeMD had an outstanding first quarter*** that demonstrated the power of our platform, the need for our services and the accelerated growth trajectory of the business as ***we achieved our first-ever quarter of GAAP profitability*** well ahead of expectations. During the quarter we expanded across all service areas, and the performance of our weight management program ***underscored our success as it is now expected to exceed top- and bottom-line expectations for the full year.***

67. These statements were false and misleading. As LifeMD later conceded in its November 2025 SEC filings, the financial metrics reported in these figures failed to correct for (or relied on metrics that failed to correct for) misstatements identified associated with the calculation of revenue, deferred revenue, accounts receivable and accrued expenses and previously identified out-of-period adjustments. These misstatements originated in 2023 and 2024, meaning the Defendants relied on inaccurate data when making the false statements identified above. The "outstanding first quarter" results LifeMD and Schreiber touted were later revised downward, showing they were inflated by accounting misstatements. These downward revisions confirmed,

among other things, that 2024 revenue, net income and adjusted EBITDA were overstated. LifeMD did not achieve its "first-ever quarter of GAAP profitability." Net income for the quarter was later revised downward by $1.57 million, turning a reported profit into a loss. Additionally, earnings per share were revised from +$0.01 to –$0.02. The Defendants were also reckless in raising guidance and celebrating the raise to investors. The Defendants' guidance lacked a reasonable basis because it relied on misstated Q1 results and ignored known operational and control issues. The Defendants knew internal controls were unreliable and that operational stressors were undermining telehealth profitability. Additionally, because the Company was nearing half-way through the quarter it is implausible that the underlying operational issues (including refunds) were not already occurring and known to Defendants.

68. The Q1 Release quoted Defendant Benathen as stating the following:

> ***LifeMD had an exceptionally strong first quarter with top- and bottom-line growth both ahead of our expectations. Telehealth revenue achieved 70% year-over-year growth on a standalone basis, while our telehealth adjusted EBITDA increased to $5.3 million from a loss of $1.3 million in the year-ago period. We also achieved positive GAAP net income for the first time***[.] ***We are raising our full-year 2025 guidance to reflect our strong performance to date for both revenue and adjusted EBITDA. We now expect total revenues in the range of $268 to $275 million, up from $265 to $275 million, and adjusted EBITDA in the range of $31 to $33 million, up from $30 to $32 million.***

69. These statements were false and misleading. As LifeMD later conceded in its November 2025 SEC filings, the financial metrics reported in these figures failed to correct for (or relied on metrics that failed to correct for) misstatements identified associated with the calculation of revenue, deferred revenue, accounts receivable and accrued expenses and previously identified out-of-period adjustments. These misstatements originated in 2023 and 2024, meaning the Defendants relied on inaccurate data when making the false statements identified above. The "exceptionally strong first quarter" results LifeMD and Benathen touted were later revised

downward, showing they were inflated by accounting misstatements. These downward revisions confirmed, among other things, that Q4 2024 revenue, net income, and adjusted EBITDA were overstated. LifeMD did not achieve "positive GAAP net income for the first time." Net income for the quarter was later revised downward by $1.57 million, turning a reported profit into a loss. Additionally, earnings per share were revised from +$0.01 to –$0.02 (or -300%). The Defendants were also reckless in raising guidance and celebrating the raise to investors. The Defendants' guidance lacked a reasonable basis because it relied on misstated Q1 results and ignored known operational and control issues. The Defendants knew internal controls were unreliable and that operational stressors were undermining telehealth profitability. Additionally, because the Company was nearing half-way through the quarter it is implausible that the underlying operational issues (including refunds) were not already occurring and known to Defendants.[7]

70. Also included in the press release were the following "First Quarter Financial Highlights" and "Financial Guidance":

[7] Defendants have not disclosed the impact of the revisions on adjusted EBITDA as originally reported. However, based on the data available it appears For Q1 2025, Telehealth adjusted EBITDA would have dropped about 30% as originally reported from $5,305,741 to $3737,259.

**First Quarter Financial Highlights**

All comparisons are with the first quarter of 2024. Non-GAAP financial measures referenced in the following results are defined and reconciled to GAAP at the end of this press release.

- Total revenues increased 49% to $65.7 million with telehealth revenue up 70%.
- Telehealth active subscribers increased 22% to approximately 290,000 active subscribers.
- Gross margin was 87% compared with 90%, down slightly due to revenue mix and LifeMD's recently launched pharmacy.
- GAAP net income was $0.6 million or $0.01 per diluted share, compared with a net loss of $7.5 million or ($0.19) per share.
- Adjusted EBITDA was $8.7 million compared with $0.1 million.
- The telehealth business achieved adjusted EBITDA of $5.3 million compared with a loss of $1.3 million.
- Cash was $34.4 million as of March 31, 2025.

**First Quarter Key Performance Metrics**

| ($ in 000s) | Three Months Ended March 31, | | | | Y-o-Y |
|---|---|---|---|---|---|
| **Key Performance Metrics** | | **2025** | | **2024** | **% Growth** |
| **Revenue** | | | | | |
| Telehealth | $ | 52,456 | $ | 30,841 | 70% |
| WorkSimpli | $ | 13,241 | $ | 13,303 | 0% |
| **Total Revenue** | **$** | **65,698** | **$** | **44,144** | **49%** |
| | | | | | |
| Active Subscribers | | | | | |
| Telehealth Active Subscribers | | 290,660 | | 237,790 | 22% |
| WorkSimpli Active Subscribers | | 158,265 | | 166,351 | -5% |
| **Total Active Subscribers** | | **448,925** | | **404,141** | **11%** |

**Financial Guidance**

For the second quarter of 2025, the Company expects:

- Total revenues in the range of $65 million to $67 million, with telehealth revenue in the range of $52 million to $53 million.
- Adjusted EBITDA in the range of $7 million to $9 million, with telehealth adjusted EBITDA in the range of $4 million to $6 million.

For the full year 2025, due to the outperformance of its telehealth business in the first quarter the Company is raising its previous guidance to:

- Total revenues in the range of $268 million to $275 million, up from previous guidance of $265 million to $275 million.
- Telehealth revenue in the range of $208 million to $213 million, up from $205 million to $213 million.
- Adjusted EBITDA in the range of $31 million to $33 million, up from $30 million to $32 million.
- Telehealth adjusted EBITDA is now forecast to exceed $21 million, up from approximately $20 million previously.

71. These statements were false and misleading. As LifeMD later conceded in its November 2025 SEC filings, the financial metrics reported in these figures failed to correct for (or relied on metrics that failed to correct for) misstatements identified associated with the calculation of revenue, deferred revenue, accounts receivable and accrued expenses and previously identified out-of-period adjustments. These misstatements originated in 2023 and 2024, meaning the Defendants relied on inaccurate data when making the false statements identified above. The full

list of corrected metrics is provided in LifeMD's restatement, as well as in the tables in Part VII, below.

72. The Q1 Release stated that "[f]or the full year 2025, due to the outperformance of its telehealth business in the first quarter the Company is raising its guidance to" and then provided the following figures:

- ***Total revenues in the range of $268 million to $275 million, up from previous guidance of $265 million to $275 million***.
- ***Telehealth revenue in the range of $208 million to $213 million, up from $205 million to $213 million***.
- ***Adjusted EBITDA in the range of $31 million to $33 million, up from $30 million to $32 million.***
- ***Telehealth adjusted EBITDA is now forecast to exceed $21 million, up from approximately $20 million previously***.

73. These statements were false and misleading. The Defendants lacked a reasonable basis in providing the guidance shown above because the Defendants relied on misstated 2023 and 2024 financials and nevertheless issued the guidance despite knowing of material weaknesses in the Company revenue-related controls. LifeMD had disclosed material weaknesses in ITGCs, IPE, SOC review, and review/approval of key financial information. As LifeMD's November disclosures confirm, these weaknesses—which existed during 2023 to 2024 audits—directly affected revenue recognition in contrast to managements representations.

**F. May 6, 2025 – Earnings Call**

74. On the same day, LifeMD conducted its Q1 2025 Earnings Call (the "Q1 Call") after markets had closed.

75. Defendant Benathen reiterated on the Q1 Call that LifeMD was raising its guidance for 2025 ***"due to the outperformance of our Telehealth business to-date."***

76. These statements were false and misleading. The Defendants lacked a reasonable basis in providing the guidance shown above because the Defendants relied on misstated 2023 and 2024 financials and nevertheless issued the guidance despite knowing of material weaknesses in the Company revenue-related controls. LifeMD had disclosed material weaknesses in ITGCs, IPE, SOC review, and review/approval of key financial information. As LifeMD's November disclosures confirm, these weaknesses—which existed during 2023 to 2024 audits—directly affected revenue recognition in contrast to managements representations.

77. Defendant Schreiber also made the following statement on the Q1 Call:

> ***As we conclude our prepared remarks, I want to underscore how energized we are by LifeMD's strong start to 2025. Our first quarter performance reflects disciplined execution against our strategic priorities and the early traction we're seeing across key initiatives gives us strong confidence in our trajectory for the remainder of the year.***

78. This statement was false and misleading as Defendants recognized several factors that contributed to the Company's purported "strong start to 2025," but failed to disclose a material factor—specifically that the Company had been recognizing revenue as a principle, in violation of GAAP, and had inflated its revenue, materially increasing net income amongst other line items as shown in Part VII below.

79. The Q1 Call included the following exchange:

> **Analyst:** Hi. Congrats on the great quarter and thank you for taking the questions. So first just looking at your guidance for Telehealth, like raising the lower end for revenues following a strong quarter. This looks like you're spending Telehealth to be roughly flat sequentially. ***Is this just being conservative or there's some headwinds that you're anticipating that will limit your ability to grow sequentially.***
>
> **Defendant Benathen:** Yeah. No. It's not that there's headwinds. I mean there's some timing in the revenue that we have. I mean, ***we tend to take a relatively conservative view to revenue….*** Obviously, there's tremendous growth year-on-year and that's essentially how we're managing the business versus just managing for sequential growth every single quarter.

80. This statement was false and misleading as the Company's recognizing revenue as a principle rather than an agent is not conservative, but completely improper under GAAP, and inflated its revenue, materially increasing net income amongst other line items as shown in Part VII below.

81. On May 6, 2025, LifeMD's stock price opened at $7.35 per share. By the end of the day, after the LifeMD issue a press release teasing its quarterly results, LifeMD's stock closed at a price of $7.76 per share. LifeMD held its earnings call while markets were closed. The stock opened at $8.14 due to after-hours trading and closed at a price of $8.01 per share. Over the course of the two days, the stock price increased by 10.2% ($0.75) on net.

82. Several analysts celebrated the good news, with one financial author writing that "It looks as if LifeMD is starting an acute growth inflection that could dramatically change how the Street's outlook is going forward."

## VI. THE TRUTH BEGINS TO EMERGE

83. On August 5, 2025, after the market closed, the Company issued a press release entitled "LifeMD Reports Second Quarter 2025 Results." The August 2055 announcement partially revealed the truth by drastically revising down the following about what financial ranges the Company now expected for 2025, based upon improper revenue recognition, yet providing new guidance inflated by the revisions that would later be announced on November 17, 2028:

> Total revenue in the range of ***$250 million to $255 million, compared with previous guidance of $268 million to $275 million.***
>
> Telehealth revenue in the range of ***$195 million to $200 million, compared*** with ***$208 million to $213 million previously.***
>
> Adjusted EBITDA in the range ***of $27 million to $29 million, compared with $31 million to $33 million previously.***
>
> Telehealth adjusted **EBITDA is now forecast to be in the range of $14 million to $16 million, down from $21 million previously.**

84. On this news, the price of LifeMD common stock fell $5.31 per share, or 44.8%, to close at $6.53 on August 6, 2025.

85. The above statements were false and/or misleading as they omitted material facts necessary in order to make the statements made, in light or the circumstances under which they were made, not misleading.

86. First, the Defendants misstated the Company's financial performance as would be revealed by the Company's November restatement For example, for the six months ended June 30, 2025 (Q1 and Q2 2025) operating income was overstated by over 300%, LifeMD did not incur a profit, but a loss:

| Financial Metric | Previously Reported | Adjustment | As Revised | %Change | %Understated |
|---|---|---|---|---|---|
| Operating Income | $1,636,152 | ($1,113,372) | $522,780 | -68.05% | 212.97% |
| Net Income (Loss) | $346,850 | ($1,113,372) | ($766,522) | -321.00% Flip to Loss | 145.25% |
| Net Loss Attrib. to Common Stockholders | ($2,243,195) | ($1,113,372) | ($3,356,567) | 49.63% | 33.17% |
| EPS (Diluted) | ($0.05) | ($0.03) | ($0.08) | 60.00% | 37.50% |

87. On November 5, 2025, the Company announced (in a press release and Form 8-K filed with the SEC) it would reschedule its Third Quarter 2025 earnings release and conference call to November 17, 2025, and would notify the U.S. Securities and Exchange Commission of a late filing of its Form 10-Q for the period ended September 30, 2025, revealing $4.6 million in improperly recognized revenue:

> The change to LifeMD's third quarter 2025 earnings release date relates to corrections the Company identified related to the recognition of revenue with offsetting related balance sheet accounts for the twelve months ended December 31, 2023, December 31, 2024 and the six months ended June 30, 2025. ***The cumulative impact of these changes will be approximately $4.6*** million, or approximately 1.4% of cumulative revenue reported for the twelve months ended December 31, 2024 and six months ended June 30,

> 2025. Based on the Company's assessment, these required adjustments will not materially impact how reported revenue results compared to guidance for the reporting periods during this timeframe.

88. On this news, the price of LifeMD common stock fell $.37 per share or 3.7%, to close at $5.26 per share on November 6, 2025.

89. On November 12, 2025, the Company filed with the SEC a Form 12b-25 stating:

> LifeMD, Inc. (the "Company") has determined that it was unable to file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2025 (the "Form 10-Q") by November 10, 2025, the original due date for such filing, without unreasonable effort or expense because it requires additional time to complete its financial statements. The Company requires additional time to finalize adjustments necessary to correct errors related to the over-recognition of revenue. The Company has identified approximately $4.6 million in cumulative over recognition of revenue, with offsetting amounts in the related balance sheet accounts, in its filings for quarterly and annual periods between 2022 and June 30, 2025. The required adjustments to correct the errors will not impact the Company's cash flow or cash position. The Company is also evaluating the potential impact of these matters on internal control over financial reporting.

90. On this news, the price of LifeMD common stock fell $.45 per share or 8.9%, to close at $4.62 per share on November 13, 2025.

91. On November 17, 2025, the Company filed its Quarterly Report on Form 10-Q for the period ended September 30, 2025. This filing, submitted a week after the statutory deadline, contained a critical disclosure in Note 3: Revisions to Previously Issued Financial Statements. The Company revealed cumulative accounting misstatements resulting in the over-recognition of approximately $4.6 million in revenue spanning fiscal years 2022 through the first half of 2025. These misstatements necessitated adjustments to historical financial data, fundamentally altering the Company's reported profitability profile during and before the Class Period.

92. Note 3 of the Q3 10-Q Note 3 to the unaudited condensed financial statements, alleged that the misstatements identified were "associated with the calculation of revenue, deferred

revenue, accounts receivable and accrued expenses", some of which allegedly "related to the recording of net revenue as agent in certain arrangements with the Company's third-party pharmacy providers, which resulted in the misstatement of revenue in its previously issued 2023, 2024 annual and interim financial statements and its previously issued 2025 interim financial statements."

93. The Company also presented tables revealing the effect of the revisions on the financial statements previously issued as of and for the year ended December 31, 2024, for the three months ended September 30, 2024, as of and for the nine months ended September 30, 2024, as of and for the three months ended March 31, 2025, for the three months ended June 30, 2025 and as of and for the six months ended June 30, 2025 as a result of the error corrections described above, as well as additional adjustments previously not alluded to. Year-over-year comparisons for Q1 and Q2 of each year, respectively, were not provided. Rather, the Company stated that:

> The Company will effect such revisions to its consolidated balance sheet as of December 31, 2024 and its consolidated statement of operations, consolidated statement of changes in stockholders' equity (deficit) and consolidated statement of cash flows for the year ended December 31, 2024 in connection with the future filing of its 2025 Annual Report on Form 10-K, which contain this comparative period and will effect the revisions for the three months ended March 31, 2025 and the three and six months ended June 30, 2025 in connection with the future filings of its Form 10-Q which contain these comparative periods.

94. Amongst other revelations, the revisions/ adjustments showed material adjustments to multiple line items of importance to investors, including accounts receivable, deferred revenue liabilities, total stockholder deficit, operating losses, net loss attributable to LifeMD, Inc., etc, for FY25 ended December 31, 2024 (adjusting the 10-K filed on March 11, 2025).

| | As of and for the Year Ended December 31, 2024 | | |
|---|---|---|---|
| | As Previously Reported | Adjustment | As Revised |
| **Consolidated Balance Sheet:** | | | |
| Accounts receivable | $ 8,217,813 | $ 2,636,271 | $ 10,854,084 |
| Other current assets | $ 2,672,231 | $ 1,000,000 | $ 3,672,231 |
| Total Current Assets | $ 48,733,089 | $ 3,636,271 | $ 52,369,360 |
| Total Assets | $ 72,460,026 | $ 3,636,271 | $ 76,096,297 |
| Accrued expenses | $ 20,811,763 | $ 2,000,000 | $ 22,811,763 |
| Deferred revenue | $ 14,480,917 | $ 5,145,023 | $ 19,625,940 |
| Total Current Liabilities | $ 60,255,145 | $ 7,145,023 | $ 67,400,168 |
| Total Liabilities | $ 76,505,394 | $ 7,145,023 | $ 83,650,417 |
| Accumulated deficit | $ 236,253,218 | $ 3,597,713 | $ 239,850,931 |
| Total LifeMD, Inc. Stockholders' Deficit | $ 5,485,501 | $ 3,597,713 | $ 9,083,214 |
| Non-controlling interest | $ (1,440,133) | $ (88,961) | $ (1,529,094) |
| Total Stockholders' Deficit | $ 4,045,368 | $ 3,508,752 | $ 7,554,120 |
| Total Liabilities, Mezzanine Equity and Stockholder's Deficit | $ 72,460,026 | $ 3,636,271 | $ 76,096,297 |
| **Consolidated Statement of Operations:** | | | |
| Telehealth revenue, net | $ 158,438,631 | $ (3,614,556) | $ 154,824,075 |
| Total revenues, net | $ 212,453,838 | $ (3,614,556) | $ 208,839,282 |
| Gross profit | $ 188,385,359 | $ (3,614,556) | $ 184,770,803 |
| General and administrative expenses | $ 72,662,021 | $ (1,482,913) | $ 71,179,108 |
| Total expenses | $ 204,530,040 | $ (1,482,913) | $ 203,047,127 |
| Operating loss | $ (16,144,681) | $ (2,131,643) | $ (18,276,324) |
| Loss from operations before income taxes | $ (18,326,498) | $ (2,131,643) | $ (20,458,141) |
| Net loss | $ (18,728,498) | $ (2,131,643) | $ (20,860,141) |
| Net income attributable to noncontrolling interests | $ 153,234 | $ 395,641 | $ 548,875 |
| Net loss attributable to LifeMD, Inc. | $ (18,881,732) | $ (2,527,284) | $ (21,409,016) |
| Net loss attributable to LifeMD, Inc. common stockholders | $ (21,987,982) | $ (2,527,284) | $ (24,515,266) |
| Basic loss per share attributable to LifeMD, Inc. common stockholders | $ (0.53) | $ (0.07) | $ (0.60) |
| Diluted loss per share attributable to LifeMD, Inc. common stockholders | $ (0.53) | $ (0.07) | $ (0.60) |
| **Consolidated Statement of Changes in Stockholders' Equity (Deficit):** | | | |
| Accumulated deficit | $ 236,253,218 | $ 3,597,713 | $ 239,850,931 |
| Non-controlling interest | $ (1,440,133) | $ (88,961) | $ (1,529,094) |
| **Consolidated Statement of Cash Flows:** | | | |
| Net loss | $ (18,728,498) | $ (2,131,643) | $ (20,860,141) |
| Accounts receivable | $ (2,940,563) | $ (1,647,760) | $ (4,588,323) |
| Other current assets | $ (1,737,721) | $ (1,000,000) | $ (2,737,721) |
| Deferred revenue | $ 5,652,319 | $ 4,262,316 | $ 9,914,635 |
| Accrued expenses | $ 7,502,624 | $ 517,087 | $ 8,019,711 |
| Net cash provided by operating activities | $ 17,513,190 | $ - | $ 17,513,190 |

16

95. So too, the tables revealed material adjustments to multiple line items of importance to investors in revisions/adjustments the results for the first quarter 2025 ended March 31, 2025, including operating income, net income, net loss attributable to LifeMD, Inc.

| | As of and for the Three Months Ended March 31, 2025 | | |
|---|---|---|---|
| | As Previously Reported | Adjustment | As Revised |
| **Condensed Consolidated Statement of Operations:** | | | |
| Telehealth revenue, net | $ 52,456,481 | $ (1,568,582) | $ 50,887,899 |
| Total revenues, net | $ 65,697,756 | $ (1,568,582) | $ 64,129,174 |
| Gross profit | $ 57,054,040 | $ (1,568,582) | $ 55,485,458 |
| Operating income | $ 2,542,924 | $ (1,568,582) | $ 974,342 |
| Net income | $ 1,916,649 | $ (1,568,582) | $ 348,067 |
| Net income (loss) attributable to LifeMD, Inc. | $ 1,384,804 | $ (1,568,582) | $ (183,778) |
| Net income (loss) attributable to LifeMD, Inc. common stockholders | $ 608,241 | $ (1,568,582) | $ (960,341) |
| Basic earnings (loss) per share attributable to LifeMD, Inc. common stockholders | $ 0.01 | $ (0.03) | $ (0.02) |
| Diluted earnings (loss) per share attributable to LifeMD, Inc. common stockholders | $ 0.01 | $ (0.03) | $ (0.02) |
| **Condensed Consolidated Statement of Changes in Stockholders' Equity (Deficit):** | | | |
| Accumulated deficit | $ 235,644,977 | $ 5,166,295 | $ 240,811,272 |
| Non-controlling interest | $ (1,935,978) | $ (88,961) | $ (2,024,939) |
| **Condensed Consolidated Statement of Cash Flows:** | | | |
| Net income | $ 1,916,649 | $ (1,568,582) | $ 348,067 |
| Accounts receivable | (1,974,961) | 1,507,106 | (467,855) |
| Deferred revenue | 144,985 | 61,475 | 206,460 |
| Net cash provided by operating activities | $ 3,068,387 | $ - | $ 3,068,387 |

| | For the Three Months Ended June 30, 2025 | | |
|---|---|---|---|
| | As Previously Reported | Adjustment | As Revised |
| **Condensed Consolidated Statement of Operations:** | | | |
| Telehealth revenue, net | $ 48,563,672 | $ 455,210 | $ 49,018,882 |
| Total revenues, net | $ 62,218,185 | $ 455,210 | $ 62,673,395 |
| Gross profit | $ 54,787,281 | $ 455,210 | $ 55,242,491 |
| Operating loss | $ (906,772) | $ 455,210 | $ (451,562) |
| Net loss | $ (1,569,799) | $ 455,210 | $ (1,114,589) |
| Net loss attributable to LifeMD, Inc. | $ (2,074,874) | $ 455,210 | $ (1,619,664) |
| Net loss attributable to LifeMD, Inc. common stockholders | $ (2,851,436) | $ 455,210 | $ (2,396,226) |
| Basic loss per share attributable to LifeMD, Inc. common stockholders | $ (0.06) | $ 0.01 | $ (0.05) |
| Diluted loss per share attributable to LifeMD, Inc. common stockholders | $ (0.06) | $ 0.01 | $ (0.05) |

| | As of and for the Six Months Ended June 30, 2025 | | |
|---|---|---|---|
| | As Previously Reported | Adjustment | As Revised |
| **Condensed Consolidated Statement of Operations:** | | | |
| Telehealth revenue, net | $ 101,020,153 | $ (1,113,372) | $ 99,906,781 |
| Total revenues, net | $ 127,915,941 | $ (1,113,372) | $ 126,802,569 |
| Gross profit | $ 111,841,321 | $ (1,113,372) | $ 110,727,949 |
| Operating income | $ 1,636,152 | $ (1,113,372) | $ 522,780 |
| Net income (loss) | $ 346,850 | $ (1,113,372) | $ (766,522) |
| Net loss attributable to LifeMD, Inc. | $ (690,070) | $ (1,113,372) | $ (1,803,442) |
| Net loss attributable to LifeMD, Inc. common stockholders | $ (2,243,195) | $ (1,113,372) | $ (3,356,567) |
| Basic loss per share attributable to LifeMD, Inc. common stockholders | $ (0.05) | $ (0.03) | $ (0.08) |
| Diluted loss per share attributable to LifeMD, Inc. common stockholders | $ (0.05) | $ (0.03) | $ (0.08) |
| **Condensed Consolidated Statement of Changes in Stockholders' Equity (Deficit):** | | | |
| Accumulated deficit | $ 238,496,413 | $ 4,711,085 | $ 243,207,498 |
| Non-controlling interest | $ (2,164,934) | $ (88,961) | $ (2,253,895) |
| **Condensed Consolidated Statement of Cash Flows:** | | | |
| Net income (loss) | $ 346,850 | $ (1,113,372) | $ (766,522) |
| Accounts receivable | $ 887,684 | $ 645,683 | $ 1,533,367 |
| Deferred revenue | $ (2,690,893) | $ (32,312) | $ (2,723,205) |
| Accrued expenses | $ (5,865,264) | $ 500,000 | $ (5,365,264) |
| Net cash provided by operating activities | $ 11,707,834 | $ - | $ 11,707,834 |

These accompanying notes to the unaudited condensed consolidated financial statements reflect the impact of this revision.

96. Also on November 17, 2025, the Company issued a press release, also attached to its Form 8-K filed on that date in which the Company reduced full-year 2025E revenue guidance, with tele-health revenue now expected to be $192M- $193M (vs. $195M-$200M prior, and which included a ~$1.1M drag from the revenue revision). The FY25 guidance included Adjusted EBITDA in the range of $13.5 million to $14.5 million.

97. On this news, the price of LifeMD common stock fell $.64 per share or 13.5%, to close at $4.09 per share on November 18, 2025.

98. As a result of the Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## VII. THE DEFENDANTS' RESTATEMENTS WERE MATERIAL

99. As discussed above, SEC Staff Accounting Bulletin No. 99 expressly prohibits the use of "rules of thumb" or purely numerical thresholds—such as a 5% difference threshold—to justify the omission of misstatements.

100. Nevertheless, Defendants' restated financials make clear that the magnitude of their misstated financial metrics for the fourth quarter of 2024 and the full fiscal year of 2024 were material. These magnitudes are demonstrated by the table below comparing the financial metrics the Defendants initially reported in May for their 2024 fiscal year to the revised (and purportedly more accurate figures) the Defendants were forced to release in November 2025.

| Item | Previously Reported | Adjustment | As Revised | %Change | %Overstated | Material (>5%)? |
|---|---|---|---|---|---|---|
| **Consolidated Balance Sheet:** | | | | | | |
| Accounts receivable | $8,217,813 | $2,636,271 | $10,854,084 | 32.08% | -24.29% | Yes |
| Other current assets | $2,672,231 | $1,000,000 | $3,672,231 | 37.42% | -27.23% | Yes |
| Total Current Assets | $48,733,089 | $3,636,271 | $52,369,360 | 7.46% | -6.94% | Yes |
| Total Assets | $72,460,026 | $3,636,271 | $76,096,297 | 5.02% | -4.780% | No |
| Accrued expenses | $20,811,763 | $2,000,000 | $22,811,763 | 9.61% | -8.80% | Yes |
| Deferred revenue | $14,480,917 | $5,145,023 | $19,625,940 | 35.53% | -26.20% | Yes |

| | | | | | | |
|---|---|---|---|---|---|---|
| Total Current Liabilities | $60,255,145 | $7,145,023 | $67,400,168 | 11.86% | -10.60% | Yes |
| Total Liabilities | $76,505,394 | $7,145,023 | $83,650,417 | 9.34% | -8.50% | Yes |
| Accumulated deficit | $236,253,218 | $3,597,713 | $239,850,931 | 1.52% | -1.50% | No |
| Total Stockholders' Deficit | $4,045,368 | $3,508,752 | $7,554,120 | 86.74% | -46.45% | Yes |
| **Consolidated Statement of Operations:** | | | | | | |
| Telehealth revenue, net | $158,438,631 | ($3,614,556) | $154,824,075 | -2.28% | 2.33% | No |
| Total revenues, net | $212,453,838 | ($3,614,556) | $208,839,282 | -1.70% | 1.73% | No |
| Gross profit | $188,385,359 | ($3,614,556) | $184,770,803 | -1.92% | 1.96% | No |
| General and administrative expenses | $72,662,021 | ($1,482,913) | $71,179,108 | -2.04% | 2.08% | No |
| Total expenses | $204,530,040 | ($1,482,913) | $203,047,127 | -0.73% | 0.73% | No |
| Operating loss | ($16,144,681) | ($2,131,643) | ($18,276,324) | 13.20% | 11.660% | Yes |
| Loss from operations before income taxes | ($18,326,498) | ($2,131,643) | ($20,458,141) | 11.63% | 10.42% | Yes |
| Net loss | ($18,728,498) | ($2,131,643) | ($20,860,141) | 11.38% | 10.22% | Yes |
| Net income attrib. to noncontrolling interests | $153,234 | $395,641 | $548,875 | 258.19% | -72.08% | Yes |
| Net loss attrib. to LifeMD, Inc. | ($18,881,732) | ($2,527,284) | ($21,409,016) | 13.38% | 11.80% | Yes |
| Net loss attrib. to LifeMD, Inc. common stockholders | ($21,987,982) | ($2,527,284) | ($24,515,266) | 11.49% | 10.31% | Yes |
| Basic loss per share | ($0.53) | ($0.07) | ($0.60) | 13.21% | 11.67% | Yes |

| | | | | | | |
|---|---|---|---|---|---|---|
| Diluted loss per share | -$0.53 | ($0.07) | -$0.60 | 13.21% | 11.67% | Yes |
| **Consolidated Statement of Cash Flows:** | | | | | | |
| Net loss | ($18,728,498) | ($2,131,643) | ($20,860,141) | 11.38% | 10.22% | Yes |
| Accounts receivable | ($2,940,563) | ($1,647,760) | ($4,588,323) | 56.04% | 35.91% | Yes |
| Other current assets | ($1,737,721) | ($1,000,000) | ($2,737,721) | 57.55% | 36.53% | Yes |
| Deferred revenue | $5,652,319 | $4,262,316 | $9,914,635 | 75.41% | -42.99% | Yes |
| Accrued expenses | $7,502,624 | $517,087 | $8,019,711 | 6.89% | -6.45% | Yes |
| Net cash provided by operating activities | $17,513,190 | | $17,513,190 | | n/a | n/a |

101. The magnitude of the Defendants' misstated financials for the first quarter of 2025 was also material, as demonstrated by the table below comparing what Defendant initially reported for the first quarter of fiscal year 2025 to the revised (and purportedly more accurate figures) the Defendants were forced to release in November 2025.

| Item | Previously Reported | Adjustment | As Revised | %Change | %Overstated | Material (>5%)? |
|---|---|---|---|---|---|---|
| Operating income | $2,542,924 | ($1,568,582) | $974,342 | -61.68% | 160.99% | Yes |
| Net income | $1,916,649 | ($1,568,582) | $348,067 | -81.84% | 450.66% | Yes |
| Net income (loss) attributable to LifeMD, Inc. | $1,384,804 | ($1,568,582) | ($183,778) | -113.27% | 853.52% | Yes Flip to Loss |
| Net income (loss) attributable to LifeMD, Inc. common stockholders | $608,241 | ($1,568,582) | ($960,341) | -257.89% | 163.34% | Yes Flip to Loss |

| | | | | | | |
|---|---|---|---|---|---|---|
| Basic earnings (loss) per share | $0.01 | $(0.03) | ($0.02) | -300.00% | 150.00% | Yes |
| Diluted earnings (loss) per share | $0.01 | $(0.03) | $-0.02 | -300.00% | 150.00% | Yes |
| Net income | $1,916,649 | ($,568,582) | $348,067 | -81.84% | 450.66% | Yes |
| Accounts receivable | ($1,974,961) | $1,507,106 | ($467,855) | -76.31% | -322.13% | Yes |
| Deferred revenue | $144,985 | $61,475 | $206,460 | 42.40% | -29.78% | Yes |

## VIII. ADDITIONAL FACTS IN SUPPORT OF SCIENTER

102. Numerous additional facts give rise to a strong inference that LifeMD and the Individual Defendants knew, or were deliberately reckless in not knowing, that their statements about LifeMD's revenue and earnings, projections, risk disclosures and the state of its business were false and misleading or omitted material facts necessary to make them not misleading when made.

### A. Defendant Benathen

103. Defendant Marc Benathen was appointed Chief Financial Officer of the Company in 2021. Benathen had over 18 years of experience in financial, operational, and consumer products and services senior management. Previously, he had been involved in six companies across the consumer, technology, and media industries, holding positions including Chief Financial Officer, Vice President, and Director. From 2017 through 2021, Benathen served as the Chief Financial Officer for Blink Holdings, Inc. (d/b/a Blink Fitness), a national fitness company. From 2014 to 2017, he was Vice President of Finance for Blink Fitness. From December 2010 to January 2014, he was Senior Manager of Corporate Finance at ANN Inc., a NYSE-listed retail company focused on women's fashion. He holds an undergraduate degree with honors from Baruch College.

104. Defendant Benathen had granular knowledge of the Company's finances and accounting. In a Q2 2023 statement, Benathen explicitly discussed the relationship between recognized revenue (Income Statement) and deferred revenue (Balance Sheet). In a statement to analysts in Q2 2023, Brennan stated "[w]e're actually building up a pretty healthy deferred revenue balance . . . we deferred down to the day." Then in November 2025 LifeMD disclosed misstatements involving "recognition of revenue with offsetting related balance sheet accounts". In subscription accounting, the "offsetting" account for revenue is Deferred Revenue. By admitting they over-recognized revenue (recognized it too early), LifeMD effectively admitted they under-recorded the deferred revenue liability—the exact balance Benathen claimed was being calculated "down to the day."

105. As evidenced by his own public statements, Benathen presented himself to investors as a hands-on CFO with detailed operational and financial knowledge but lacking formal accounting credentials. His public statements demonstrate: (1) granular understanding of subscription revenue economics, customer acquisition costs, and retention metrics; (2) direct involvement in (or at minimum, close supervision of) technical revenue recognition decisions; and (3) extensive investor-facing role communicating financial results.

## B. Auditor Turnover, Management Changes, and the Timing of LifeMD's Financial Revisions

106. LifeMD's sequence of auditor changes in 2025, coupled with contemporaneous management restructuring and the subsequent multi-period financial statement revisions disclosed in the Company's November 17, 2025 Form 10-Q, supports a strong inference that LifeMD knew, or was reckless in not knowing, that its previously issued financial statements were materially misstated well before it dismissed CBIZ CPAs and engaged PwC.

107. LifeMD entered 2025 with acknowledged material weaknesses in internal control over financial reporting, including deficiencies in information technology general controls (ITGCs), user access and change-management protocols, review of third-party SOC reports, and controls over information produced by the entity (IPE). These weaknesses—disclosed in both the April 25, 2025, and August 21, 2025 auditor-changed filings—directly implicated the reliability of the Company's revenue-recognition processes and the accuracy of related balance-sheet accounts.

108. On April 24, 2025, LifeMD dismissed Marcum LLP following the sale of its attest practice and appointed CBIZ CPAs P.C. as its new independent auditor. Less than four months later, on August 15, 2025, LifeMD dismissed CBIZ CPAs before the firm issued any audit report. LifeMD reported no disagreements with CBIZ on accounting principles, audit scope, or financial disclosures, and CBIZ confirmed that representation. Three days later, on August 18, 2025, LifeMD appointed PricewaterhouseCoopers LLP (PwC) as its new auditor.

109. The timing of these changes in auditors coincided with significant operational and financial stress. On August 5, 2025, LifeMD reduced its full-year revenue and adjusted EBITDA guidance, attributing the decline to elevated refund activity and operational challenges in its RexMD business. These refund-driven pressures directly relate to revenue recognition, reserves, and deferred-revenue accounting—the very areas later identified as erroneous.

110. Just days earlier, on July 31, 2025, LifeMD announced the promotion of Shayna Webb Dray to Chief Operating Officer, effective March 27, 2025. As COO, Webb Dray assumed responsibility for the Company's operational backbone, including the Care Center, Pharmacy, Clinical Operations, and the Project Management Office—functions that directly influence customer experience, refund rates, fulfillment accuracy, and the data flows that feed

revenue-recognition systems. Elevating the executive responsible for these operational systems at the same time the Company was experiencing refund-driven financial pressure and known control weaknesses further supports the inference that LifeMD was already grappling with the operational manifestations of the same issues that later required financial revisions.

111. On November 5, 2025, LifeMD filed a Form 8-K under Regulation FD announcing that it would delay its third-quarter Form 10-Q and file a Form 12b-25. The Company disclosed that it had identified misstatements in revenue recognition and related balance-sheet accounts affecting the twelve months ended December 31, 2023, the twelve months ended December 31, 2024, and the six months ended June 30, 2025. LifeMD admitted that these misstatements "originated in prior periods."

112. When LifeMD filed its delayed Form 10-Q on November 17, 2025, Note 3 detailed the scope of the revisions. The Company restated financial results for multiple periods, including Q1 and Q2 of 2025, both of which occurred during CBIZ CPAs' engagement. The revisions reduced Q1 telehealth revenue by $1.57 million and reversed previously reported net income into a net loss. Q2 revisions further adjusted revenue and net loss figures. For the six months ended June 30, 2025, LifeMD reduced total revenue by $1.11 million, increased net loss by $1.11 million, and increased loss per share from ($0.05) to ($0.08). These corrections involved revenue arrangements, deferred revenue, accounts receivable, accrued expenses, and out-of-period adjustments—core financial-reporting elements that cannot plausibly have been discovered and analyzed solely within the brief period following PwC's August 18, 2025 engagement.

113. The restated financial results also stretched back two additional years. The Company reduced 2024 telehealth revenue by $3.61 million, reduced total revenue by $3.61 million, increased net loss by (0.53) to ($0.60). Total liabilities increased by $7.15 million,

accumulated deficit worsened by $3.6 million, and stockholders' deficit deepened by $3.5 million. These corrections involved revenue arrangements, deferred revenue, accounts receivable, accrued expenses, and out-of-period adjustments—core financial-reporting elements that cannot plausibly have been discovered and analyzed solely within the brief period following PwC's August 18, 2025 engagement.

114. The timing of these events is dispositive. CBIZ CPAs was the auditor of record during the periods later revised, yet was dismissed before issuing any audit report. LifeMD did not attribute the discovery of these misstatements to PwC. PwC had been engaged for fewer than ninety days when LifeMD announced the need to revise three years of financial statements. Nor did it disclose any disagreement with CBIZ. The affected periods coincided with LifeMD's known control weaknesses, refund-driven operational stress, and the July 31, 2025 elevation of the executive responsible for the operational systems feeding the Company's financial reporting. Taken together, these facts strongly support the inference that LifeMD was aware of, or recklessly disregarded, the underlying revenue-recognition and financial-reporting issues before terminating CBIZ CPAs, and that the subsequent auditor change, delayed filing, and multi-period revisions were part of the Company's response to pre-existing problems rather than newly discovered issues.

### C. The Defendants Lacked a Reasonable Basis for the March and May 2025 Guidance.

115. The Defendants acted with scienter in issuing and later raising LifeMD's 2025 financial guidance because they knew, or were reckless in not knowing, that the financial information underlying that guidance was materially misstated, derived from unreliable internal systems, contradicted by operational indicators, and subject to undisclosed accounting misstatements that ultimately required multi-period revisions.

116. LifeMD entered 2025 with acknowledged material weaknesses in internal control over financial reporting, including deficiencies in information technology general controls

("ITGCs"), user access and change-management controls, review of third-party SOC reports, and controls over information produced by the entity ("IPE"). These weaknesses—disclosed in both the April 25, 2025 and August 21, 2025 auditor-changed filings—directly affected the reliability of the Company's revenue-recognition processes, deferred-revenue accounting, accounts-receivable balances, and accruals. The Defendants were therefore aware that the Company's financial reporting systems were incapable of producing accurate data at the time they issued guidance on March 10 and raised that guidance on May 6.

117. The November 17, 2025 Form 10-Q confirmed that LifeMD's financial results for 2023, 2024, Q1 2025, and Q2 2025—the very periods the Defendants relied upon to justify their guidance—were materially misstated. The Company revised Q1 2025 telehealth revenue downward by $1.57 million, reversed reported Q1 net income into a net loss, and reduced Q1 EPS from +$0.01 to –$0.02. For the six months ended June 30, 2025, LifeMD reduced total revenue by $1.11 million, increased net loss by $1.11 million, and increased loss per share from –$0.05 to –$0.08. These revisions directly contradict the Defendants' claims that Q1 2025 was "exceptionally strong," that telehealth revenue was accelerating, and that LifeMD had achieved "first-ever GAAP profitability."

118. The revised periods overlap exactly with the periods the Defendants cited as evidence of "strong performance" when issuing and raising guidance. Because the underlying financials were misstated, the guidance built on those financials necessarily lacked a reasonable basis.

119. The Defendants also ignored operational indicators that contradicted their guidance narrative. By early 2025, LifeMD was experiencing elevated refund rates, volatility in its RexMD

business, and operational strain in its weight-management and pharmacy programs. Refunds directly affect net revenue, deferred revenue, reserves, and customer lifetime value assumptions.

120. The operational stressors that LifeMD later identified—elevated refund rates, RexMD instability, fulfillment and pharmacy bottlenecks, and system-migration issues affecting revenue and related accounts—necessarily existed and were known to management before the Company issued guidance on March 10 and raised that guidance on May 6. Refunds, chargebacks, churn, and fulfillment metrics are core operational KPIs that LifeMD would monitor daily and that directly drive revenue, deferred revenue, and customer lifetime value. The July 31 promotion of the executive responsible for these operational systems to Chief Operating Officer, ***effective March 27***, confirms that management was already responding to operational instability during the first quarter. The subsequent revisions to Q1 and Q2 2025 results—reducing revenue, reversing reported profitability, and increasing net loss—demonstrate that these operational issues were present during the first quarter and therefore predated both the March and May guidance. Combined with LifeMD's acknowledged material weaknesses in internal controls affecting revenue recognition and refund accounting, these facts support a strong inference that the Defendants knew or recklessly disregarded that operational stressors were already undermining the assumptions embedded in the March 10 and May 6 guidance.

121. The auditor turnover during the guidance period further supports scienter. On April 24, 2025, Marcum resigned and CBIZ CPAs was appointed. On August 15, 2025, CBIZ was dismissed before issuing any audit report, and PwC was appointed three days later. The revised periods include Q1 and Q2 2025, which were under CBIZ's engagement. LifeMD dismissed CBIZ before any audit report and then announced multi-period revisions shortly after PwC's

appointment. This sequence supports the inference that the Defendants were aware of accounting issues during the guidance period and sought to avoid scrutiny.

122. Finally, the Defendants had motive and opportunity to issue aggressive guidance despite lacking a reasonable basis. LifeMD's growth narrative, capital-raising needs, and performance-based executive compensation—including RSUs tied to revenue and adjusted EBITDA—created strong incentives to portray accelerating telehealth performance. The subsequent delayed filing, auditor turnover, and multi-period revisions confirm that the Defendants knew or recklessly disregarded that their guidance was unsupported by reliable financial information.

123. For these reasons, the Defendants' March 10 and May 6 guidance statements were materially false and misleading when made, and the Defendants acted with scienter.

## D. The Unusual Timing and Amount of Insider Sales by LifeMD's Most Senior Executives Suggests Scienter.

### 1. Defendant Schreiber

124. Prior to December 2024, there are ***no*** public reports of any sales of LifeMD stock by ***any*** officer or director of LifeMD. To the contrary, prior to December 2024, LifeMD directors had collectively purchased or otherwise acquired nearly $4 million worth of the Company's public stock. Defendant Schrieber himself had purchased twice—3,000 shares at an average price of $8.54 ($29,890 in total) on May 21, 2021, and 50,000 shares at an average price of $2.0925 ($104,625 in total).

125. Yet starting on December 12, 2024, Defendant Schrieber began selling his LifeMD holdings in large bulks in nearly monthly intervals. These transactions are displayed in the chart below.[8]

| Transaction Date | Reported DateTime | Company | Symbol | Insider Relationship | Shares Traded | Average Price | Total Amount |
|---|---|---|---|---|---|---|---|
| 2025-08-01 Sale | 2025-08-05 5:14 pm | LifeMD Inc. | LFMD | Schreiber Justin Chairman and CEO | 25,000 | $9.9876 | $249,690 |
| 2025-07-01 Sale | 2025-07-03 3:53 pm | LifeMD Inc. | LFMD | Schreiber Justin Chairman and CEO | 25,000 | $13.38 | $334,458 |
| 2025-06-02 Sale | 2025-06-04 4:45 pm | LifeMD Inc. | LFMD | Schreiber Justin Chairman and CEO | 25,000 | $12.47 | $311,655 |
| 2025-05-01 Sale | 2025-05-05 6:02 pm | LifeMD Inc. | LFMD | Schreiber Justin Chairman and CEO | 25,000 | $7.5289 | $188,223 |
| 2025-04-29 Sale | 2025-05-01 4:47 pm | LifeMD Inc. | LFMD | Schreiber Justin Chairman and CEO | 50,000 | $7.7808 | $389,040 |
| 2025-02-14 Sale | 2025-02-21 5:34 pm | LifeMD Inc. | LFMD | Schreiber Justin Chief Executive Officer | 50,000 | $7.5524 | $377,620 |
| 2025-01-02 Sale | 2025-01-06 5:33 pm | LifeMD Inc. | LFMD | Schreiber Justin Chief Executive Officer | 25,000 | $5.1867 | $129,668 |
| 2024-12-02 Sale | 2024-12-04 5:07 pm | LifeMD Inc. | LFMD | Schreiber Justin Chief Executive Officer | 25,000 | $6.517 | $162,925 |
| 2023-05-22 Purchase | 2023-05-24 09:16 am | LifeMD Inc. | LFMD | Schreiber Justin CEO | 50,000 | $2.0925 | $104,625 |
| 2021-05-19 Purchase | 2021-05-21 3:10 pm | LifeMD Inc. | LFMD | Schreiber Justin Chief Executive Officer | 3,500 | $8.54 | $29,890 |

126. In a break from his pre-Class Period practices, during the period covered by the false statements at issue, Schreiber sold, in total, 300,000 shares of common stock for a total of ***$2,143,279.00.*** The amount itself is substantial when compared to Schreiber's other compensation. As described below, Schriber earned more cash from these stock sales than he received from

8 On August 5, 2025, Shreiber reported sales to the SEC on Form 4. The filed form purported to report sales from July 1, 2025. However, SEC rules require insider to report sales within two business days. And the stock prices reported therein for the purported sales conform with the prices for LifeMD common stock on August 1, 2025, rather than July 1, 2020. These factors suggest the filed form had a typo. The chart above reflects the correct date.

LifeMD in base pay and performance bonuses for the four years prior (2022, 2023, 2024, and max potential for 2025).




127. At all relevant times, Defendant Schreiber has earned compensation for his work as LifeMD through both cash and equity awards, with a heavy emphasis on bonus and stock-based compensation. For base pay, the Company currently pays Schreiber a base salary of $500,000 per year. In 2023-2024, he earned a base pay of $300,000-$315,000, and from 2018 to 2022, he earned $15,000 monthly ($180,000 annually).

128. The bulk of Schrieber's total compensation comes from other vehicles. For example, beginning on or about January 1, 2024, the Company began boosting Schrieber's total compensation by awarding him 50,000 shares of restricted stock annually. In 2024, approximately 70% of Schrieber's compensation from LifeMD came from bonuses, incentive plans, and stock awards. In 2023, nearly 66% of his compensation came from beyond his salary. On July 15, 2025, the Company entered into an amendment to the bonus agreement with Mr. Schreiber dated August 16, 2017. The amendment modified the performance-based vesting conditions of a previously granted stock option award for 50,000 common shares, by replacing pre-tax earnings.

129. Schrieber's full compensation is detailed in the following table from the Company's preliminary proxy statements.

**EXECUTIVE COMPENSATION**

The following tables and accompanying narrative present compensation for our CEO and each of the other two most highly compensated executive officers active at the end of 2024 (the "Named Executive Officers").

**Summary Compensation Table**

| Name and Principal Position | Year | Salary ($) | Bonus ($)(1) | Stock Awards ($)(2) | Non-Equity Incentive Plan Compensation ($) (3) | All Other Compensation ($) (4) | Total ($) |
|---|---|---|---|---|---|---|---|
| Justin Schreiber | 2024 | 311,250 | 102,000 | 260,000 | 378,000 | 12,209 | 1,063,459 |
| Chairman and Chief Executive Officer(5) | 2023 | 300,000 | - | 355,000 | 225,000 | 8,803 | 888,803 |
| Dennis Wijnker<br>Chief Technology Officer(6) | 2024 | 399,438 | 32,340 | 765,661 | 97,020 | 12,075 | 1,306,534 |
| Shane Biffar<br>Chief Compliance Officer and Deputy GC(7) | 2024 | 267,500 | - | 485,250 | 134,400 | 9,658 | 896,808 |

(1) Amounts include the discretionary component of the bonus earned by our Named Executive Officers under the 2024 Corporate Bonus Program, which is described below.

(2) Amounts reflect the aggregate grant date fair value of restricted stock units and stock options, computed in accordance with the provisions of Accounting Standards Codification ("ASC") Topic 718, Stock Compensation. These amounts do not reflect the actual economic value that will be realized by the employee upon the vesting, settlement or exercise of the stock option and/or stock award. The assumptions that we used to calculate these amounts are discussed in Note 2 to our audited consolidated financial statements for the fiscal year ended December 31, 2024 included in our Annual Report on Form 10-K filed with the SEC on March 11, 2025.

The value of Mr. Wijnker's performance-based restricted stock in the "Stock Awards" column assumes target performance over the performance period and is consistent with the estimate of aggregate compensation cost to be recognized over the performance period determined as of the grant date under ASC Topic 718, excluding the effect of estimated forfeitures. The value at the grant date assuming maximum performance is $651,250 for Mr. Wijnker's performance-based restricted stock, respectively.

(3) Amounts were earned by our Named Executive Officers based upon the achievement of goals under the 2024 Corporate Bonus Program, which is described below.

(4) Amounts include Company contributions to each Named Executive Officer's 401(k) accounts.

(5) Pursuant to Mr. Schreiber's Employment Agreement, effective April 1, 2022, he received an annual base salary of $300,000, which was increased to $315,000 effective April 1, 2024, and he is eligible to receive a performance bonus with a target amount of 75% of base salary.

Effective November 13, 2023, Mr. Schreiber entered into a First Amendment to the Schreiber Employment Agreement, pursuant to which he received 50,000 restricted shares of Common Stock on November 13, 2023, vesting on January 1, 2024. Effective August 20, 2024, Mr. Schreiber received 50,000 restricted shares of Common Stock, vesting immediately.

130. As a result of the lucrative stock-option-heavy compensation offered by the Company, Defendant Schreiber was highly motivated to artificially inflate the price of the Company's stock by making false and misleading statements that concealed material facts surrounding the Company's financial performance.

131. The timing of these sales is also suspicious, given their temporal alignment with the false statements at issue and the lack of any sales by Shreiber outside the periods covered by the false statements at issue.

132. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

**2. Defendant Benathen**

133. Defendant Benathen's insider sales are similarly suspicious in terms of their amounts and their timing. As discussed above, Defendant Benathen joined LifeMD as its CFO in February 2021. Prior to the Class Period, he had never sold any shares of LifeMD. His only

transactions were three small purchases of common stock in 2021—1,416 shares at an average price of $8.9052 on May 5, 2021 ($12,610 in total); 3,067 shares at an average price of $7.2665 on August 18, 2021 ($22,286 in total); and 7,831 shares at an average price of $4.09 on November 30, 2021 ($32,029 in total). As illustrated in the tables below, this changed on June 16, 2025.




| Transaction Date | Reported DateTime ▼ | Company | Symbol | Insider Relationship | Shares Traded | Average Price | Total Amount |
|---|---|---|---|---|---|---|---|
| 2025-06-16 Sale | 2025-06-18 6:18 pm | LifeMD Inc. | LFMD | Benathen Marc David Chief Financial Officer | 125,000 | $13.46 | $1,682,440 |
| 2021-11-30 Purchase | 2021-12-01 10:40 am | LifeMD Inc. | LFMD | Benathen Marc David Chief Financial Officer | 7,831 | $4.09 | $32,029 |
| 2021-08-18 Purchase | 2021-08-18 2:51 pm | LifeMD Inc. | LFMD | Benathen Marc David Chief Financial Officer | 3,067 | $7.2665 | $22,286 |
| 2021-05-19 Purchase | 2021-05-19 3:19 pm | LifeMD Inc. | LFMD | Benathen Marc David Chief Financial Officer | 1,416 | $8.9052 | $12,610 |

134. On June 16, 2025—only two weeks before the end of the quarter (two months after CBIZ had begun its work with LifeMD—Benathen sold nearly 125,000 shares of LifeMD common stock for over $1,682,440. His insider sales on a single day constituted nearly a quarter of his total equity holdings in LifeMD. Additionally, his insider sales made up 7% of the total number of LifeMD shares sold that day on the Nasdaq.

135. The timing of Benathen's sales is also suspicious given their temporal proximity to large sales made by at least two other high-level executives of LifeMD whom, like Benathen, had never sold any LifeMD stock prior to the Class Period.

| Transaction Date | Reported DateTime | Company | Symbol | Insider Relationship | Shares Traded | Average Price | Total Amount |
|---|---|---|---|---|---|---|---|
| 2025-06-16 Sale | 2025-06-18 6:18 pm | LifeMD Inc. | LFMD | Benathen Marc David Chief Financial Officer | 125,000 | $13.46 | $1,682,440 |
| 2025-06-13 Sale | 2025-06-17 6:12 pm | LifeMD Inc. | LFMD | Yecies Eric Harold Chief Legal Officer & GC | 15,000 | $12.25 | $183,750 |
| 2025-06-13 Sale | 2025-06-17 5:13 pm | LifeMD Inc. | LFMD | Galluppi Stefan Chief Innovation Officer | 85,000 | $12.38 | $1,052,657 |
| 2025-06-02 Sale | 2025-06-04 4:45 pm | LifeMD Inc. | LFMD | Schreiber Justin Chairman and CEO | 25,000 | $12.47 | $311,655 |

136. The timing of these sales is also suspicious, given their temporal alignment with the false statements at issue and the lack of any sales by Shreiber outside the periods covered by the false statements at issue.

137. The magnitude of Benathen's sale is also suspicious, as they exceed Benathen's base pay for more than the past two years combined. According to Benathen's publicly available amended employment agreement, he has been awarded a base salary of $425,000 since 2022, with an additional 75,000 restricted shares awarded in 2022, 50,000 restricted shares vesting in 2024, and 75,000 restricted shares vesting in 2025.

138. The Company has also granted Benathen an additional 411,250 restricted shares which vest upon certain performance-based milestones, including revenue and adjusted EBITDA targets.

139. As a result of the lucrative stock-option-heavy compensation offered by the Company, Defendant Benathen was highly motivated to artificially inflate the price of the Company's stock by making false and misleading statements that concealed material facts surrounding the Company's financial results. He also had powerful compensation-based incentives to overstate revenue. On July 11, 2023—during the period of revenue over-recognition—Benathen's employment agreement was amended to tie 411,250 restricted shares directly to revenue and adjusted EBITDA targets: 87,000 shares upon achieving $100 million in net revenue

with a 5% adjusted EBITDA margin; 87,000 shares upon achieving $150 million with a 10% margin; and 87,250 shares upon achieving $200 million with a 10% margin. The over-recognized revenue directly affected whether Benathen would hit these milestones. Under SEC guidance, a misstatement that has the effect of increasing management's compensation is a qualitative indicator of materiality—and here, the CFO's equity compensation was explicitly tied to the metric that was overstated.

140. Benathen's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

**E. Additional Scienter Indicators Supporting the Known Falsity at the Time the Statements were Mad.**

141. The following additional facts support a strong inference that the Defendants knew of the falsity of their statements at the time the statements were made:

a) The material known weaknesses in ITGCs, IPE, SOC review, and review/approval controls that existed during 2023–2024, as acknowledged by the Defendants strongly infer the Defendants knew the systems generating revenue and refund data were unreliable before issuing guidance.

b) The multi-period revisions covering 2023, 2024, Q1 2025, and Q2 2025 demonstrate the misstatements were systemic and long-standing, not sudden.

c) The refund spikes and RexMD instability disclosed in August are key operational issues which develop over weeks/months and are tracked daily.

d) The COO promotion effective March 27, 2025, demonstrates that management was already responding to operational instability during Q1—before the May guidance and shortly after the March guidance.

The Defendants cycled auditors (Marcum → CBIZ → PwC) during the guidance period and dismissed CBIZ before any audit report, suggesting awareness of accounting issues with which management was grappling with on how to disclose, yet retain credibility.

## IX. CLASS ACTION ALLEGATIONS

142. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than the Defendants who acquired LifeMD common stock publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are the Defendants, the officers and directors of LifeMD, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which the Defendants have or had a controlling interest.

143. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, LifeMD securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

144. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' wrongful conduct in violation of federal law that is complained of herein.

145. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

146. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by the Defendants' acts as alleged herein;
- whether statements made by the Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of LifeMD;
- whether the Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused LifeMD to issue false and misleading filings during the Class Period;
- whether the Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of LifeMD securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

147. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

148. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- LifeMD shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- As a public issuer, LifeMD filed periodic public reports;
- LifeMD regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- LifeMD' securities were liquid and traded with moderate to heavy volume during the Class Period; and
- LifeMD was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

149. Based on the foregoing, the market for LifeMD securities promptly digested current information regarding LifeMD from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

150. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as the Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**COUNT I**

**Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants**

151. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

152. This Count is asserted against the Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

153. During the Class Period, the Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or

deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

154. The Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of LifeMD securities during the Class Period.

155. The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of LifeMD were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of LifeMD, their control over, and/or receipt and/or modification of LifeMD' allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning LifeMD, participated in the fraudulent scheme alleged herein.

156. The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other LifeMD personnel to members of the investing public, including Plaintiff and the Class.

157. As a result of the foregoing, the market price of LifeMD securities was artificially inflated during the Class Period. In ignorance of the falsity of the Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of LifeMD securities during the Class Period in purchasing LifeMD securities at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

158. Had Plaintiff and the other members of the Class been aware that the market price of LifeMD securities had been artificially and falsely inflated by the Defendants' misleading statements and by the material adverse information which the Defendants did not disclose, they would not have purchased LifeMD securities at the artificially inflated prices that they did, or at all.

159. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

160. By reason of the foregoing, the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of LifeMD securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

161. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

162. During the Class Period, the Individual Defendants participated in the operation and management of LifeMD, and conducted and participated, directly and indirectly, in the

conduct of LifeMD' business affairs. Because of their senior positions, they knew the adverse non-public information about LifeMD's business practices.

163. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to LifeMD' financial condition and results of operations, and to correct promptly any public statements issued by LifeMD which had become materially false or misleading.

164. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which LifeMD disseminated in the marketplace during the Class Period concerning LifeMD' results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause LifeMD to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of LifeMD within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of LifeMD securities.

165. Because of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by LifeMD.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

A. Declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

B. Awarding damages in favor of plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

C. Awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper

**JURY TRIAL DEMAND**

Plaintiff hereby demands a jury trial by jury.

DATED: January 30, 2026

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

BY *<u>/s Lucas E. Gilmore</u>*
Lucas E. Gilmore (*pro hac vice*)
Reed R. Kathrein (*pro hac vice* pending)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel. (510) 725-3030
Fax. (510) 725-3001
lucasg@hbsslaw.com
reed@hbsslaw.com

Nathaniel A. Tarnor
594 Dean Street Suite 8
Brooklyn, NY 11238
Tel. (646) 543-4992
nathant@hbsslaw.com

Raffi Melanson (*pro hac vice* pending)
1 Faneuil Hall Sq., 5th Floor
Boston, MA 02109
Tel. (617) 475-1978
raffim@hbsslaw.com

*Lead Counsel for Lead Plaintiff Gehui*